FILED

2004 FEB -9 P 3: 55

U.S. DISTRICT COURT
HARTFORD, CT.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

FRANK SEVER, JR.,                              :
                                               :
            Plaintiff,                         :   CIVIL ACTION NO.: 3:02CV722 (AVC)
                                               :
    v.                                         :
                                               :
MORTON G. GLICKMAN, DELCATH                    :
SYSTEMS, INC., and STEPHEN E.                  :
FELDMAN,                                       :
                                               :
            Defendants.                        :   February 9, 2004


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE TO EXCLUDE ALLEGED TAPE RECORDING

Defendants Dr. Morton G. Glickman, Delcath Systems Inc. ("Delcath"), and Stephen E. Feldman, Esq. ("Feldman") (jointly, "Defendants") submit this memorandum of law in support of their motion in limine to preclude Plaintiff Frank L. Sever, Jr. ("Sever") from offering into evidence a tape recording which he alleges was made of a conversation with Feldman in the summer of 1997. The recording is inadmissible because it is not authentic, was obtained in violation of law and is protected from disclosure by the attorney-client privilege. The peculiarly prejudicial nature of tape recordings requires this Court to direct Plaintiff's counsel not to offer or refer to the alleged tape recording before the jury.

STAM1-744776-1

## ARGUMENT

### I.

### THE ALLEGED TAPE RECORDING IS NOT AUTHENTIC

Rule 901 of the Federal Rules of Evidence requires that the proponent of a piece of evidence demonstrate authenticity as a condition precedent to admissibility. As the Second Circuit observed in *United States v. Sliker*, 751 F.2d 477, 497 (2d Cir. 1984), a case involving authenticity of a tape recording under Rule 901:

> In order for a piece of evidence to be of probative value, there must be proof that it is what the proponent says it is. The requirement of authentication is thus a condition precedent to admitting the evidence.

(emphasis added). This general requirement has special applicability to evidence in the form of tape recordings, "since recorded evidence is likely to have a strong impression upon a jury and is susceptible to alteration." *United States v. Fuentes*, 563 F.2d 527, 532 (2d Cir. 1977) (emphasis added). As a result, the burden on the proponent of a tape recording is to prove by "clear and convincing evidence" the authenticity and accuracy of such recording. *Id.* (emphasis added); see also *United States v. Ruggiero*, 928 F.2d 1289, 1304 (2d Cir. 1991) *cert. denied* 502 U.S. 938 (1991). Sever must present proof of authenticity sufficient to meet this higher standard, and this Court must determine that the burden has been met, before the alleged tape recording may be presented to the jury. See *Sliker*, 751 F.2d at 499-500; *United States v. Bello*, 1991 U.S. Dist. LEXIS 3677 (S.D.N.Y. 1991).

2

In determining whether the tape recording in this case is authentic, this Court may consider the following factors from *United States v. McKeever*, 169 F.Supp. 426, 430 (S.D.N.Y. 1958) *aff'd in relevant part* 271 F.2d 669, 675-676 (2d Cir. 1959):

> (1) That the recording device was capable of taking the conversation now offered in evidence.
>
> (2) That the operator of the device was competent to operate the device.
>
> (3) That the recording is authentic and correct.
>
> (4) That changes, additions or deletions have not been made in the recording.
>
> (5) That the recording has been preserved in a manner that is shown to the court.
>
> (6) That the speakers are identified.
>
> (7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.

While the Second Circuit has held that application of these factors is not mandatory, and a tape recording may be admitted without meeting every one, the Court of Appeals also observed in *Fuentes* that, "we continue to regard the 'elements' listed in Judge Herland's [*McKeever*] opinion as a valuable formulation of the factors a trial judge should consider in making an initial determination whether a sufficient foundation for the admissibility of the tape recording[ ] has been established." 563 F.2d at 532. Application of these factors to this case confirms that the alleged tape recording is not admissible.

Judges within the Second Circuit, in determining the admissibility of tape recordings, have paid special attention to whether changes, additions or deletions have been made to the

3

proffered tape. For example, in *Fuentes,* the issue considered was whether the informant had tampered with the recording by turning it on and off. *Id.* The court rejected that allegation because the government presented evidence that the taping was monitored by a DEA agent and actually recorded remotely by the agent. *Id.* The court noted that "had Fuentes so desired he could have called an expert to examine the tapes for evidence of tampering." *Id.*

In *Bello,* before trial the defendant alleged that portions of conversations had been cut out of the recording. 1991 U.S. Dist. LEXIS 3677, at *1. The court adjourned the trial to permit the defense to retain an expert to examine the tape. *Id.*, at *2. At a subsequent hearing, the court ruled the tape was admissible after the defense expert testified that any stop/start signatures "were consistent with the stopping and starting of the tape between conversations" and agreed with the government's expert that "the tape had not been altered and was exactly the same as the day it was made." *Id.*, at *6. *See also Ruggiero,* 928 F.2d at 1304 (tape admissible where FBI proved adequate chain of custody and defendants did "not claim any specific instance of tampering or suspected tampering.")

In the present case, the facts are very different. Defendants' expert tested the tape and found:

> 2. The tape has an over recording at 11:48, a stop start at 23:57, two more over recordings at 24:15 and 24:26 and a final stop at 24:45. Addition recording from a different person is also recorded on Side A.
>
> 3. The recorder provided made the tape.
>
> 4. The tape does not represent a continuous conversation and is interrupted in no less than 4 spots. (see event list and marked transcript)

4

> 5. The presence of these discoverable edits show conclusively and with scientific certainty that this tape is not reliable as a true and accurate portrayal of what took place within the conversation or conversations. Over recordings have omitted material which is no longer recoverable.

Expert Report of Tom Owen, Owl Investigations dated August 13, 2003. (Summary attached hereto as Exhibit A).[1] Based upon these findings, Defendants' expert concluded:

> It is the opinion of this examiner based on my experience and training that the tape I examined, because of the over recordings and omission of material is **NOT AUTHENTIC** and should not be considered as reliable evidence.

*Id.*

While the expert, Mr. Owen, determined that the tape recording stopped four times, Mr. Sever testified repeatedly at his deposition that there was only one continuous conversation on the tape. *See* Sever Deposition dated December 30, 2002 ("Sever Dep."), p. 4, line 25 to p. 5, line 11; p. 13, lines 10-13. (Copy of Sever Dep. excerpts attached hereto as Exhibit B). Mr. Sever concluded by testifying:

> Q. And it's one telephone conversation from start to finish?
>
> A. One telephone conversation.
>
> Q. Not multiple conversations?
>
> A. Not multiple. Not multiple conversations.
>
> Q. Okay.
>
> A. It's just a continuous conversation.

(Sever Dep., p. 24, line 23 to p. 25, line 4.)

---

[1] Mr. Owen will be available to testify concerning his expert qualifications, testing methodology and conclusions.

5

In addition, Mr. Sever testified that he "never" pushed the pause button to stop the recording (Sever Dep., p. 5, lines 23-25; p. 6 lines 2-4) and that no one altered the tape:

>   Q. Do you know if anyone has ever altered the tape?
>
>   A. You know, no. The answer is "no".
>
>   Q. To the best of your knowledge it's never been altered?
>
>   A. Yes.

*Id.*, p. 24, lines 17-22.

Even the individual previously proffered by Sever as an expert, David Marisay[2] contradicts Sever. Mr. Marisay states unequivocally that the recording is of two separate conversations.

> The A side of the tape had two contiguous recording conversations starting from the beginning: Conversation #1 11' 40 in length and conversation #2: 12'54" in length.

Report of David Marisay, dated January 10, 2003 (Copy attached hereto as Exhibit C). Mr. Marisay also indicates there was a start and stop of the recorder at the "restart of the second conversation." *Id.*

Subsequent to the date of Mr. Marisay's report, Sever prepared a certificate of corrections to his deposition. Rather than simply correcting errors in the transcription by the reporter, however, Sever attempted to change his sworn testimony. The changes mirror the conclusions of Mr. Marisay that there were two conversations and that Sever stopped and started the recorder. For example, Sever states:

---

[2] Defendants do not concede Mr. Marisay is an expert and wish to voir dire him in that regard before any testimony from him concerning authenticity.

6

> Page 5, line 25 to page 6, line 7, now reads: "Never…" it should read: --In listening to the tape after the instant deposition, my present recollection was refreshed. The "A" side of the tape consists of a recorded conversation with a break in the middle. The second portion of the conversation is a continuation of the first. At the end of the first conversation, Feldman advised me that he had to take another call and that he would call me back. When he hung up signifying the end of the first portion, I turn the tape recorder off. When the phone rang, signifying the beginning of the second portion, I turned the tape recorder on.--

Sever Certificate dated February 24, 2003, p. 1.

Sever's deposition testimony, and his subsequent attempts to contradict what he specifically testified, so effect his credibility that Sever can not be relied upon by this Court to authenticate the tape. At the very least, his competence as the operator of the recording device is seriously called into question. Further, Sever can produce no evidence that the recording has been properly preserved. To the contrary, Sever testified that he merely placed it in his desk drawer (Sever Dep. p. 18, lines 1-4) and that he did not recall whether it stayed in the drawer or he took it out. *Id.*, at lines 21-23. Sever also testified that he moved from Virginia to Florida between the time when the recording was made and when he had copies made. (Sever Dep. p. 4, lines 12-22; p. 10, line 23 to p. 12, line 12). In fact, Sever testified that he believed he lost the recorder on which the tape was made, explaining:

> Q. Well, how shortly after the conversation you had with Mr. Feldman did you last see this tape recorder?
>
> A. I can't recall. I can't recall.
>
> Q. Did you use it ever again after the conversation with Mr. Feldman?

>   A.   I don't think so. It kind of – I think -- no, I can't recall what happened to it. You know, I really don't. I moved several times, a number of times after the conversation with Feldman and we had to put our things in storage a couple of times and move them, and it just got misplaced or lost or maybe stolen. I don't know.
>
>   Q.   Well, have you had a break-in in your house? How do you know?
>
>   A.   Well, that was just an option. I don't know. I am just speculating.
>
>   Q.   You have no idea where the tape recorder is today?
>
>   A.   Actually, we did have a break in at our house a time or two, but I don't think they would both to go after a $35 tape recorder.

(Sever Dep. p. 10, line 16 to p. 11, line 10)[3] Thus the tape recording was never secured, moved multiple times and a house where it was left was broken into. Considering all the factors set forth in *McKeever*, Sever can not demonstrate compliance with factors 2 through 5, while 6 and 7 remain in question. Particularly given the admission, by Sever's own proffered expert that the recording was stopped and started, as well as the findings of Mr. Owen that portions of the tape were recorded over, wiping out portions of the conversation, the tape recording cannot be considered authentic under Rule 901 and should be held inadmissible.[4]

---

[3] Subsequently, prior to the April 2003 discovery conference Sever found the recorder which was tested by Mr. Owen and confirmed as having made the tapes.

[4] In addition, Connecticut law requires both parties' consent or a conversation may not be recorded. Conn. Gen. Stat. § 52-570(d); *Lord v. Lord*, 2002 Conn. Super. LEXIS 2748 (Bridgeport Super. Ct. August 20, 2002). Clearly, Sever cannot offer evidence that both parties to the alleged conversation consented to the taping. Therefore, the recording was made illegally.

## II.

## THE TAPE RECORDED CONVERSATION IS PRIVILEGED

Whether or not the recording at issue in this case was authentic, it would still not be admissible under Rule 501, Federal Rules of Evidence because the attorney-client privilege applies to such a conversation between Sever and Feldman.

First, there can be no dispute that an attorney-client relationship existed between Sever and Delcath. In his complaint, Sever states he is a registered patent attorney (Complaint, ¶ 10), that he accepted work from Feldman from time to time (Complaint, ¶ 12) and that in 1997 he undertook and completed work for Feldman relating to designing around a particular patent. (Complaint, ¶¶ 13-18). At his deposition, Sever admitted that the work to design around the patent came from Delcath (Sever Dep., p. 38, lines 10-13) and that such work is "common practice in the profession." (Sever Dep., p. 43, lines 9-10). Sever stated:

> Q. You mentioned before that attorneys very often are asked to come up with ways around patents. Is that correct?
>
> A. Yes.
>
> Q. And <u>they are hired by their clients to do that?</u>
>
> A. Yes.

(Sever Dep., p. 59, lines 17-23) (emphasis added). With regard to the particular work for Delcath, which is the subject of this case, Sever testified:

> Q. You were retained by Mr. Feldman on behalf of his client to come up with ways to avoid - - I think its call the Tower patent. Is that what that's called?
>
> A. Yes.

9

>   Q.   Okay. And did you accept the retention?
>
>   A.   Yes, I accepted it but - -
>
>   Q.   Just one by one. You accepted that retention?
>
>   A.   Right.
>
>   Q.   And did you perform that work?
>
>   A.   I came up with two proposals.
>
>   Q.   Did you perform the work?
>
>   A.   Yes.

(Sever Dep. p. 43, line 14 to p. 44, line 1).

Thus, there was an attorney-client relationship between Sever and Delcath. In this relationship, Feldman acted as the corporation's agent. Feldman was originally retained by Delcath and then Feldman, on Delcath's behalf, retained Sever to perform certain portions of the legal work (preparing the draft patent application and reviewing the existing patent to see if it could be designed around). Sever himself described the work he did for clients at the request of Feldman as being "a subcontractor." (Sever Dep., p. 28, line 2).

A conversation between two attorneys representing a single client is privileged. The basic rule in Connecticut[5] is that:

> the attorney-client privilege protects both the confidential giving of professional advice by an attorney acting in the capacity of a legal advisor to those who can act on it, as well as the giving of information to the lawyer to enable counsel to give sound and informed advice.

---

[5] Under Fed. R. Evid. 501, Connecticut privilege law applies.

*Blumenthal v. Kimber Manufacturing, Inc.*, 265 Conn. 1, 10 (2003) quoting *Olson v. Accessory Controls & Equipment Corp.*, 254 Conn. 145, 156-57 (2000). The privilege is not limited to the attorney and the client only. Communications to and from the representative of the client are protected as well. *See Olson*, 254 Conn., at 157-158. In *Olson*, a communication involving a party hired by a representative of a corporate entity was found subject to the privilege, "despite the fact that the communication was not made by the client itself to the attorney." *Id.*, at 154; *see also Pagano v. Ippoliti*, 245 Conn. 640, 650 n.12 (1998) (statements made by agent on behalf of principal to principal's attorney privileged); In *re Grand Jury Subpoenas*, 179 F.Supp. 2d 270, 283 (S.D.N.Y. 2001) (communications between two attorneys for single client privileged).

The remaining issue is whether the conversation at issue constituted the giving of legal advice or the giving of information to the attorney. Was the conversation, in the language relied on by *Blumenthal*, "communication relating to [the] purpose" of seeking legal advice? 265 Conn., at 10. First, Delcath clearly retained both Feldman and Sever seeking legal advice on designing around a patent and applying for a new patent. Moreover, the particular alleged conversation dealt with legal issues directly related to that retention. To find the alleged conversation not privileged because Sever, as an attorney, was only raising ethical issues about a particular course of action being considered by the client (through its representative) would be to drastically and improperly restrict the application of the privilege. As the Connecticut Supreme Court has recognized, the privilege "fosters full and frank communications between attorneys and their clients and thereby <u>promotes the broader public interests in the observation of law</u> and [the] administration of justice." *Olson*, 254 Conn., at 157 quoting *Upjohn Co. v. Aetna Casualty*

11

& *Surety*, 449 U.S. 383, 389 (1981) (emphasis added). If counsel retained for a particular task can not freely express their ethical concerns about a course of action, the observation of law will not be promoted. Certainly, Sever believed so at the time, as he testified at his deposition:

> Q. And certainly much of the topics you were talking about with Mr. Feldman dealt with matters that Mr. Feldman referred to you - - - so that Mr. Feldman could provide legal advice to his client, right?
>
> A. Um-hum.
>
> Q. Is that correct?
>
> A. Yes.
>
> Q. You understood what you were doing was also attorney work yourself, right?
>
> A. Yes.
>
> Q. And protected by the attorney/client privilege in some sense?
>
> A. I don't think that it was the type - - well let me say "yes".

(Sever Dep., p. 103, lines 10-23).[6]

Here, Sever, the attorney seeks to waive the privilege by offering the conversation into evidence. However, the privilege belongs to the client and can not be waived by the attorney. *See In re Richard Roe, Inc.*, 168 F.3d 69, 72 (2d Cir. 1999) (former attorney of corporation may not waive privilege, "since a corporate employee cannot waive the corporation's privilege, that same individual as an ex-employee cannot do so.") Nor can Sever contend that his attorney-

---

[6] In the unusual circumstances of this case, where the conversation was between two attorneys for a single client, the privilege would apply whether Sever is viewed as giving legal advice, or as providing information to Feldman to be used in providing future legal advice to Delcath.

12

client relationship has ended, freeing him from the limitations of the privilege, since, "[t]he duty of confidentiality continues even after the client-lawyer relationship has terminated and applies not merely to matters communicated in confidence by the client but also to all information relating to the representation whatever its source." Connecticut Bar Association Committee on Ethics, Informal Opinion, 90-1; *see also Sage Realty v. Proskauer Rose, Goetz & Mendelson LLP,* 91 N.Y.2d 30, 37 (1997) (fiduciary relationship continues after representation complete).

In this case, therefore, the alleged conversation between two attorneys, Sever and Feldman, both retained by Delcath, dealing with issues of patent application and ethical responsibilities is privileged.[7] Delcath, as the holder of the privilege, has not waived it and, therefore, any testimony concerning, or recording of, the conversation is inadmissible.

## **CONCLUSION**

Sever cannot present clear and convincing evidence of the authenticity of the tape recording and it is, therefore, inadmissible. Further, the substance of the conversation is a privileged attorney-client communication and is inadmissible for that reason as well.

---

[7] Sever can not defeat the privilege by claiming the crime-fraud exception occurs. That exception has two requirements: (1) probable cause to believe a crime or fraud occurred and (2) that the particular communication was intended to facilitate the crime or fraud. *Olson,* 254 Conn. at 171-175. *In re Richard Roe,* 168 F.3d 69, 70 (2d Cir. 1999) Here Sever admitted in his deposition that the conversation did not provide evidence of fraud (Sever Dep. p. 67, line 19 to p. 69, line 12). Further, there is nothing in this particular conversation that in any way facilitated a fraud, if other evidence of one existed.

13

Dated: Stamford, Connecticut
       February 9, 2004

                        DEFENDANTS MORTON G. GLICKMAN,
                        DELCATH SYSTEMS INC. AND
                        STEPHEN E. FELDMAN

By: /s/ Thomas Donlon
    Joseph L. Clasen, Esq. (ct04090)
    Thomas J. Donlon, Esq. (ct22839)
    e-mail: jclasen@rc.com
    ROBINSON & COLE LLP
    Financial Centre
    695 East Main Street
    Post Office Box 10305
    Stamford, CT 06904-2305
    Telephone: (203) 462-7500
    Facsimile: (203) 462-7599

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via first class mail, postage prepaid to counsel of record for the Plaintiff, Frank B. Velardi, Jr., Esq., Lasala, Walsh, Wicklow & Velardi, 168 Bradley Street, New Haven, Connecticut 06511 and to Peter Paul Mitrano, Esq., 581 Boylston Street, Suite 201, Boston, Massachusetts 02116, this 9th day of February, 2004.

_____
THOMAS J. DONLON