**UNITED STATES DISTRICT COURT FILED**
**FOR THE DISTRICT OF CONNECTICUT**
**Hartford**

2004 MAR -1  A 10: 22

U.S. DISTRICT COURT
HARTFORD, CT.

| | |
|---|---|
| FRANK SEVER, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Civil Action No. 3:02cv722 (AVC) |
| | ) |
| MORTON G. GLICKMAN, *et al.*, | ) Date of this Pleading: February 27, 2004 |
| | ) |
| Defendants. | ) |

**Plaintiff's Opposition to Defendants' Motion in Limine to Exclude Alleged Tape Recording and Request for Entry of an Order Adopting Defendants' Version of Transcript**

Plaintiff, Frank Sever, Jr. (hereinafter sometimes referred to as "Sever"), by and through his undersigned attorneys, states Plaintiff's Opposition to Defendants' Motion in Limine to Exclude Alleged Tape Recording and Request for Entry of an Order Adopting Defendants' Version of Transcript[1] as follows:

### Summary

Defendants' references to the expert report of Owl Investigations are misleading because said report does not cite any problems with the portion of the telephone conversation that is the subject of this lawsuit. Moreover, defendants' reliance on *United States v. McKeever* on page 3 is misplaced. See *United States v. Hamilton*, 334 F.3d 170, 186 (2nd Cir. 2003).

---

[1] Pursuant to the Local Rules of the United States District Court for the District of Connecticut, plaintiff respectfully requests oral argument.

1

## The Expert Report of Tom Owen of Owl Investigations dated August 13, 2003

The expert report of Tom Owen of Owl Investigations dated August 13, 2003 includes a section wherein the page marked page number "1" is entitled "Transcript Produced by Transcription Service" and states:

"PARSLEY ASSOCIATES INC
328 Flatbush Avenue, Suite 251
Brooklyn, NY 11238
(718) 789-0620"

The next pages marked page "2" through and including the page marked page "7" state the following:

"ATTORNEY/CLIENT PRIVILEGED

"THE REFERENCES MARKED FELDMAN ARE ALLEGED TO BE STEPHEN FELDMAN

"(recording begins)

"(sound of dialing numbers, phone rings)

"F VOICE:   Mr. Feldman's office.

SEVER:   Yes, is ah Steve there?

F VOICE:   Who's calling?

SEVER:   Frank Sever?

F VOICE:   One moment.

(pause)

FELDMAN:   Hi, big Frank.

SEVER:   How you doing Steve?

2

FELDMAN: Okay, I know you've been hiding from me because, ah I was thinking it was bad breath.

SEVER: Yeah.

FELDMAN: Is that true?

SEVER: No, Steve, its something a little bit more than that.

FELDMAN: What?

SEVER: And that's -- that's these ah, these, Delcath ah, ah catheter patents. And ah, . I'm,/I'm a little gun shy about this, Steve. Because I think of at the very least if, if I did the inventing on these things then -- and your filing -- and your filing a declaration or an oath on these things saying that somebody else has done it, then, then that's unethical at the very least. And, and, and I don't do unethical things.

FELDMAN: Yeah.

SEVER: And, I'm getting a little god damn gun shy about this.

FELDMAN: Well, which one are you talking about?

SEVER: I'm talking about the, ah, the last one in particular that you asked for the drawings on, which, which - ah, which I thought died on the vine? The one ah, the telescoping ah, ah, frame or the telescoping tube catheter. Do you know that -- do you know which one I'm talking about?

FELDMAN: Yeah, you wrote that -- you charged me for that, Frank.

SEVER: Well, ah, ah, ah -- yeah but but ah Steve, (laugh) you don't understand. What we're

3

|||
|---|---|
| | -- what we're doing here -- you know, we had this discussion I guess about two or three months ago or a couple of months ago when the, when the situation first arose. I said I don't feel comfortable, ah, ah, ah being the inventor on these things. And do you remember? You remember -- |
| FELDMAN: | Sure. |
| SEVER: | -- when I said well, maybe all, all -- you know, you said well they're not interested in it. And I said well, maybe I should file on it. And you went ah -- you said well, no you'll get me in trouble. See, here's what the situation is in a nutshell, Steve. When you file -- when you file a patent application you have to disclose who the inventors are, and, and, if if you don't, you're tampering with some pretty, pretty heavy stuff. You know you can't be -- you know, it's like filing a false affidavit or a false oath. |
| FELDMAN: | Well, would you feel more comfortable if we don't file that one? |
| SEVER: | Yes. Absolutely. That, that scares the shit out of me, Steve, because I don't want to get involved in anything unethical. |
| FELDMAN: | Well, -- |
| SEVER: | And that's basically the bottom line. |
| FELDMAN: | Okay. Well, why didn't you mention this to me a long long time ago? |
| SEVER: | Well, -- |
| FELDMAN: | Because if you had I would have said let's forget about that one and ended it at that. |
| SEVER: | Okay. |

4

FELDMAN: You see, you put me in a little bit of a bind here.

SEVER: Yeah, but the point, the point being, Steve is that I thought that it did die on the vine, and now you're, you're resurrecting it.

FELDMAN: No, no, no. It never died on the vine. See look, --

SEVER: Yeah.

FELDMAN: Let me -- I've been in this game a little longer than you. You've been at the patent office.

SEVER: Yes. Yes, you have.

FELDMAN: And -- hold on a second. (away from phone) *Who is that? Is that Tom Conrad? Yeah, tell him to come on in.*

SEVER: Ah, do you understand what my problem is?

FELDMAN: Frank. [indiscernible] --

SEVER: I don't want to act unethically at all.

FELDMAN: Frank, let me just tell you what the bottom line is.

SEVER: Okay.

FELDMAN: Over the years – now, I'm going to tell you something between the two of us, --

SEVER: Alright.

FELDMAN: -- and I know it's the same with every. every patent attorney [indiscernible] really, you know, lays it on you correctly. And I know I'm not being recorded and I know it's not going any further --

SEVER: No..

5

FELDMAN:  -- than this conversation, but every patent attorney in practice has invented either entire patent applications [indiscernible]

SEVER:  And I, and I know what you're saying, Steve, I know exactly what you're saying. But, but there --

FELDMAN:  And I'll tell you one quick thing.

SEVER:  Yeah.

FELDMAN:  With one of my clients. I no longer represent him, but that was simply because they weren't paying my bills, --

SEVER:  Yeah.

FELDMAN:  -- they have two basic patents; they're mine.

SEVER:  Well, yeah, but the point is, the point is if you file on that god damn oath -- you know, the chances of of this ever coming to court are one in a billion, right. But god damn, you know --

FELDMAN:  Yeah, but what I did with those patents, I convinced the client that he was the inventor. Now, if you don't want me to file on that one with *your name*[2]--(italicize emphasis added)

SEVER:  I would prefer that you didn't.

FELDMAN:  [indiscernible]

SEVER:  I would prefer you didn't, because I just feel uncomfortable about it.

---

2   Instead of hearing "your name", Sever hears the tape to read:

"FELDMAN: Yeah, but what I did with those patents, I convinced the client that he was the inventor. Now, if you don't want me to file on that one with *the thing*."

6

FELDMAN: But, you understand that --

SEVER: You see, and I was, I was a little gun shy about that slidable balloon. You know, that -- you know, that's going over the line, Steve, and, I don't do things that are unethical. Have you ever had a bar complaint filed against you?

FELDMAN: Yeah.

SEVER: I had one filed by my ex-wife, and they're very unpleasant things. You know, you're -- you know you're guilty before, ah, you know.

FELDMAN: No, the woman who filed one against me was crazy and they saw through it.

SEVER: Um.

FELDMAN: And they dismissed it out of hand.

SEVER: Well, that's, that's what's been bothering me, ah, you know, these – this couple of weeks.

FELDMAN: Frank, let me, let me just tell you --

SEVER: Yeah.

FELDMAN: -- if that was the reason you weren't doing work for me and that was the reason you weren't returning my calls --

SEVER: Well, that is. That is, because --

FELDMAN: Well, why didn't you tell me that?

SEVER: Well, I'm telling you now, Steve, because --

FELDMAN: Yeah, but we're big boys. You see, you can't let me run with the ball and do things and then get into trouble. You got to say it to me at the start --

7

SEVER: Well, yeah, but you see, that -- I thought this was settled, particularly with that, with that telescoping one, that, that this was settled right off the bat, that, they're not interested. And you didn't pay me for that one, as a matter of fact. (laughs)

FELDMAN: I didn't?

SEVER: I thought that one died on the vine. You know that's my understanding of it. But, you know, be that as it may, you know, I don't want to do this any more, ah, you know, I don't want to do any more inventing, you know, cause I, -- you know, I just don't feel comfortable with that.

FELDMAN: Well did, did I do it at the start or did you do it?

SEVER: Do what?

FELDMAN: Did the inventing. You called me up and you say hey, I have a great idea. (laughs)

SEVER: Yeah, well, I said, I said well, there's -- you know, ah, ah, you sent me a letter –

FELDMAN: Yeah.

SEVER: -- saying, you know, get around this patent, and I (laughs)

FELDMAN: You didn't understand what I wanted.

SEVER: And I didn't understand what you wanted, you know. And I'm saying, you know, you can't, you can't just merely amend around this patent. You gotta, you know, you gotta make a difference in kind.

FELDMAN: Okay, let me just tell you, --

SEVER: Right.

8

> FELDMAN: -- I will work that out.
>
> SEVER: Okay, well, that's all, that's all I wanted to hear from you.
>
> FELDMAN: But why don't you do this, in the future, if you have any problems --
>
> SEVER: Okay. Okay.
>
> FELDMAN: -- pick up the phone –
>
> SEVER: I will call. I will communicate with you.
>
> FELDMAN: I'm a big boy
>
> SEVER: Okay. Super. Super.
>
> FELDMAN: You can tell me. Um, now, on this patent, fluoride solution ampule for treating dental implants, --
>
> SEVER: Right."

The remainder of the conversation dealt with other matters. Note on the left hand margin there is written in pencil "7:40" just before "FELDMAN: I'm a big boy". Thus, the relevant portion of said telephone conversation ended just after "7:40".

Sever hereby stipulates that the above-quoted portion of the transcript from the expert report of Tom Owen of Owl Investigations dated August 13, 2003 is a correct version of the taped conversation. In other words, Sever hereby accepts said above-quoted portion of the transcript from the expert report of Tom Owen of Owl Investigations dated August 13, 2003 as binding upon Sever for all purposes.

As stated in part by the defendants on pages 4 and 5 of their memorandum under "Conclusions" on the second sheet that was marked as page numbered 2 of the expert report of Tom Owen of Owl Investigations dated August 13, 2003, it is stated in part that:

> **"Conclusions:**
>
> "1.   The tape is an original tape.
>
> 2.   The tape has an over recording at 11:48, a stop start at 23:57, two more over recordings at 24:15 and 24:26 and a final stop at 24:45. Addition recording from a different person is also recorded on Side A.
>
> 3.   The recorder provided made the tape.
>
> 4.   The tape does not represent a continuous conversation and is interrupted in no less that 4 spots. (see event list and marked transcript) . . . ."

The marked transcript (a portion of which is quoted above) is marked at times 11:57, 24:06, 24:22 and 24:32 which are on pages marked 12 and 23. Also note that on page 23 of said transcript, it is stated:

> "I, Stanley Gerin, certify that the above is a true and accurate transcript of the audio tape labeled 'Sever Tape 10/29/02" which was provided to me by Stephen E. Feldman, Esq.
>
> \_\_\_\_/s/\_\_\_\_            \_\_\_\_\_12-13-02\_\_\_\_\_
> Stanley Gerin"

In addition, after the first tab of the expert report of Tom Owen of Owl Investigations dated August 13, 2003, it is stated:

> "Steve Feldman Orig Tape 52903
>
> 01)   Leader                            00:00:00:048.231

```
02)   Start Rec from Leader         00:00:07:672.585
03)   Acoustical Signature (Noise)  00:07:41:983.039
04)   "Talk"                        00:11:48:883.288
05)   Erase Head                    00:11:49:036.145
06)   S/S                           00:23:57:797.937
07)   Start Rec                     00:23:58:147.982
08)   Discontinuity                 00:24:15:073.946
09)   Discontinuity                 00:24:26:529.161
10)   Final off                     00:24:45:711.565
11)   Start Record                  00:24:46:229.887
12)   S/S                           00:26:20:849.274
13)   Start Rec                     00:26:21:427.392"
```

Thus, defendants' own expert found that "The tape is an original" and also "The recorder provided made the tape". Accordingly, the arguments by the defendants related to the tape recorder on pages 7 and 8 of their memorandum seem disingenuous.

### Request for Entry of an Order Adopting Defendants' Version of Transcript

Based upon the foregoing, Sever respectfully requests that this Court enter an order adopting the above-quoted portion of defendants' version of the transcript as stated in the expert report of Tom Owen of Owl Investigations dated August 13, 2003 as the transcript agreed upon by the parties of the conversation that is the subject of this lawsuit.

### Defendants' Reliance on *McKeever* is Misplaced

Contrary to defendants' arguments on page 3 to the middle of page 4 of their memorandum related to *McKeever*, defendants' reliance on *McKeever* is contrary to the law of the Second Circuit. Sever respectfully directs the Court's attention to *United States v. Hamilton*, 334 F.3d 170, 186, 187 (2nd Cir. 2003) wherein the Second Circuit rejected *McKeever*, stating in part that:

11

". . . In support of their contention, defendants cite cases from other circuits . . . (citations omitted) which adopted a formal, seven-factor approach to the admission of audio recordings as enunciated in *United States v. McKeever*, 169 F. Supp. 426, 430 (S.D.N.Y.1958), *rev'd on other grounds*, 271 F.2d 669 (2d Cir. 1959), including a requirement of proof that statements elicited were made 'without any kind of inducement.' *Starks*, 515 F.2d at 121 n. 11 (quoting *McKeever*); *McMillan*, 508 F.2d at 104 (same). **This Court, however, has expressly and repeatedly declined to adopt the *McKeever* approach, refusing to 'adopt[ ] a rigid standard for determining the admissibility of tape recordings.'** *United States v. Fuentes*, 563 F.2d 527, 532 (2d Cir.1977), *cert. denied*, 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977); *see also United States v. Sliker*, 751 F.2d 477, 500 (2d Cir.1984), *cert. denied*, 471 U.S. 1137, 105 S.Ct. 2679, 86 L.Ed.2d 697 (1985). In *Fuentes*, we noted that 'the varying circumstances of particular cases in which one or another aspect of this problem may present itself militate against our adoption of inflexible criteria applicable to all cases.' 563 F.2d at 532. Instead, 'we have adopted a general standard, namely, that the government 'produce clear and convincing evidence of authenticity and accuracy' as a foundation for the admission of such recordings.' *Id.* (quoting *United States v. Knohl*, 379 F.2d 427, 440 (2d Cir.), *cert. denied*, 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967)). We see no reason to adopt a more rigid standard in this case. A tape recording may be admitted in evidence when it has been properly authenticated 'by evidence sufficient to support a finding that the matter in question is what its proponent claims.' Fed.R.Evid. 901(a); *see, e.g., United States v. Tropeano*, 252 F.3d 653, 661 (2d Cir.2001); *United States v. Barone*, 913 F.2d 46, 49 (2d Cir.1990). Once a relevant tape recording has been sufficiently authenticated, any question as to the veracity of the recorded statements and the credibility of the speakers goes to the evidence's weight rather than to its admissibility." (Bold emphasis added.)

Sever respectfully submits that the argument that defendants have based upon *McKeever*, are untenable, in view of *Hamilton*. The defendants are clearly mistaken in their reliance upon *McKeever*:

Also see *United States v. Degaglia*, 913 F.2d 372, 378 (7th Cir. 1990), wherein the court stated in part that:

> "Mr. Degaglia also alleges that a word on the tape is unclear. We have noted that, '[g]**enerally, tape recordings which are only partially unintelligible are admissible unless the recording as a whole is rendered untrustworthy by the unintelligible portions**.' *United States v. Camargo*, 908 F.2d 179, 183 (7th Cir.1990); see also *United States v. Vega*, 860 F.2d 779, 790 (7th Cir.1988); *United States v. Zambrana*, 841 F.2d 1320, 1337 (7th Cir.1988). Whether a recording is untrustworthy is left to the sound discretion of the district court. *Camargo*, 908 F.2d at 183; *Zambrana*, 841 F.2d at 1337. Based on our review of the record, including the tape, we cannot say that the recording was so untrustworthy as to be inadmissible. See *Vega*, 860 F.2d at 790-91 ('discretion was properly exercised in admitting the tapes because the tapes were generally audible, and, even if inaudible in parts, such inaudibility would go only to the weight, a jury question, rather than the admissibility, of the identification evidence and the tapes themselves'). Moreover, in this case, the jurors specifically were instructed that there was a dispute over a single word on the tape and that it was their job to determine what had been said. See *United States v. Alvarez*, 860 F.2d 801, 812 (7th Cir.1988) (no error to admit tapes where parties disputed the content of the conversation: 'The conflicting testimony of [each parties' witness as to what had been said] ... was weighed and assessed by the jury in reaching its verdict. Such a credibility determination is uniquely for the jury.'). Thus, we conclude that the district court properly exercised its discretion in admitting the June 16 recording in redacted form." (Bold emphasis added.)

Thus, *arguendo*, even if part of the tape was unintelligible, the tape is still admissible.

## The Tape is Legal

The original tape and transcript of the tape speak for themselves and are conclusive on the accuracy of the recorded words. See, e.g., *Osborn v. United States*, 385 U.S. 323, 327 (1966), noting:

> "There is no question of the accuracy of the recording . . . It provided strong corroboration of the truth of the charge against the petitioner . . . (footnote omitted.)."

Also see *United States v. Vanwort*, 887 F.2d 375, 384 (2nd Cir. 1989), wherein the court stated:

> "The proof against Chapoteau, both from his own tape-recorded admissions and from the testimony of others, conclusively established his involvement in the conspiracy . . . ."

Virginia law controls the *legality* of the interception of the taped conversation. In a dissenting opinion in *Perry v. State*, 357 Md. 37, 741 A.2d 1162, 1196 (Md. 1999), Judge Cathell of the Maryland Court of Appeals summarized the majority trend of the legality of the law of telephone interceptions in his dissent stating in part that:

> "The majority trend among our sister states is **'the law that controls the legality of an interception is the law of the place wherein the interception takes place.'** *United States v. Gerena*, 667 F. Supp. 911, 913 (D. Conn. 1987) (quoting *United States v. Bennett*, 538 F. Supp. 1045, 1047 (D.P.R. 1982)) . . . ." (Footnote omitted.) (Bold emphasis added.)

14

The Code of Virginia, Section 19.2-62 B.2 provides in pertinent part that:

> "2.  It shall not be a criminal offense under this chapter for a person to intercept a wire, electronic or oral communication, where such person is a party to the communication . . . ."

Also note that in New York, it is lawful to record a telephone conversation if one is a party to the conversation or has received the consent of a party to the communication. See *People* v. *Lasher*, 447 N.E.2d. 70, 71 (N.Y. 1983).

## The Tape is Authentic

In *United States* v. *Tropeano*, 252 F.3d 653, 661 (2nd Cir. 2001), the court stated in part that:

> ". . . In Barroso's case, the brokers who authenticated the tapes **had firsthand knowledge of the conversations and each identified the voices on the tapes**.
>
> ". . . *United States v. Fuentes*, 563 F.2d 527 (2d Cir. 1977). In *Fuentes*, we upheld the admission of tapes as sufficiently authenticated by evidence of an unbroken chain of custody. See *id*. at 532. However, our upholding the authentication of tapes by establishing a chain of custody in the absence of testimony by a contemporaneous witness to the recorded conversations does not imply, as appellant suggests, that such a witness cannot provide equally sufficient authentication without proof of a chain of custody. Indeed, appellant's position is contrary to the plain language of Rule 901. See *United States v. Barone*, 913 F.2d 46, 49 (2d Cir. 1990) . . . see also *Pluta*, 176 F.3d at 49 ('The burden of authentication does not require the proponent of the evidence to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be. Rather, **the standard for authentication, and hence for admissibility, is one of reasonable likelihood**.' (quoting *United States v. Holmquist*, 36 F.3d 154, 168 (1st Cir. 1994)). Finally,

15

*Fuentes* also noted that 'this Circuit has never expressly adopted a rigid standard for determining the admissibility of tape recordings.' 563 F.2d at 532.

**"Authentication of course merely renders the tapes admissible, leaving the issue of their ultimate reliability to the jury . . . Any doubts raised by such a challenge would, however, go to the weight to be given to the tapes by the jury, not to their admissibility.** See *United States v. Sovie*, 122 F.3d 122, 127-28 (2d Cir. 1997); *Albert*, 595 F.2d at 290." (Bold emphasis added.)

In *Ricketts v. City of Hartford*, 74 F.3d 1397, 1410-1411 (2nd Cir. 1996), the Court noted:

"In determining that the question of authentication was primarily for the jury to determine, we undertook an examination of the relevant rules . . .

"The requirement that a given piece of evidence be what its proponent claims does not reflect some special evidentiary policy like hearsay rules or privileges. . . . Authentication is perhaps the purest example of a rule respecting relevance: evidence admitted as something can have no probative value unless that is what it really is. Cf. Notes of Advisory Committee to Rule 901(a). Thus, the Notes of the Advisory Committee accompanying Rule 901 state that questions concerning authentication are governed by the procedures in Rule 104(b).

"Under Rule 104(b), the trial judge may make a preliminary determination as to the prior fact and admit the evidence to the jury's final determination that the prior fact exists. . . .

"The judge's preliminary determination does not, however, finally establish the authenticity of the tape. As with other matters under Rule 104(b), only