UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
Hartford

FRANK SEVER, JR.,              )
                               )
            Plaintiff,         )
                               )
v.                             )   Civil Action No. 3:02cv722 (AVC)
                               )
MORTON G. GLICKMAN, et al.,    )   Date of this Pleading: April 28, 2004
                               )
            Defendants.        )

**Memorandum in Support of Plaintiff's Motion for Sanctions Because of Defendants Failure to Comply with this Court's Order Dated February 10, 2004**

Plaintiff, Frank Sever Jr., by and through his undersigned attorneys, states his Memorandum in Support of Plaintiff's Motion for Sanctions Because of Defendants Failure to Comply with this Court's Order Dated February 10, 2004[1] as follows:

Reference is made to plaintiff's second motion for an order to compel discovery filed on or about July 21, 2003 (document no. 83 on the case docket report) seeking an order from this Court requiring the defendants to produce discovery. On February 10, 2004, this Court entered an Endorsement Order (document 100 on the case docket report) stating in part that:

> "The plaintiff also seeks an order from this court requiring the defendants to produce documents that the defendants contend are confidential. **The defendants shall have to and including March 5,**

---

1.   Pursuant to the Rules of the United States District Court for the District of Connecticut, plaintiff respectfully requests oral argument.

1

**2004 to produce relevant documents.** Such production shall be in compliance with the protective order. SO ORDERED." (Bold emphasis added)

Although this motion seeks production of all overdue documents (not otherwise legitimately subject to attorney-client privilege), plaintiff particularly seeks production of the patent application, referenced by defendant Feldman in his letter dated June 6, 1997, to Jonathan Foltz (hereinafter sometimes referred to as the "phantom application"). In that letter Feldman purported to "enclose an application[2] for a so-called "slight variation" of "Mort Glickman's Lateral Movement Controller with an incompressible fluid between the walls" (hereinafter sometimes referred to as the "Foltz letter"). The Foltz letter was belatedly relinquished by defendants in response to a discovery request made by Sever and only under the pressure of plaintiff's second motion to compel discovery.

By way of background, the only reference to a non-compressible fluid (or incompressible fluid, as defendants have referred to it) occurs with respect to

---

2. Throughout the instant record, plaintiff has consistently maintained that the concept of a "slight variation" of "Mort Glickman's" Lateral Movement Controller "with an incompressible fluid between the walls" is utterly implausible and unworkable; and thus, is drawn to either: (a) a fictitious, non-existent phantom application; or, (b) a patently implausible application, manufactured by defendants after-the-fact, in an attempt to reconcile Glickman's fraudulent claim of inventorship with the non-refutable evidence of record, e.g.: the Sever facsimiles; and, Sever's innocent mistake of referring to the First Option, as the Second Option in his original complaint. Thus, Sever contends that defendants have not produced the phantom application either because: it does not presently exist; or, they are reluctant to produce it for fear that it will be exposed as fraudulent.

the second option disclosed in the two Sever facsimiles[3], dated May 22, 1997 and May 30, 1997 respectively. Said second option is in no way related to a telescoping frame, as evident from the following description:

## Explanation of the Second Option of the Sever Facsimiles



FIG. 1     FIG. 2

FIG. 3     FIG. 4

The second option[4] of the Sever facsimiles is a modification of the Tower patent, whereby, the annular space between outer tubular wall 20 and inner

---

3. Note that as Sever previously stated in his Plaintiff's Memorandum in Support of Plaintiff's Motion for Summary Judgment Against Morton G. Glickman on the Issue of Liability, and in the Alternative, Plaintiff's Request Under Rule 56(d) for a Ruling that the Material Facts Stated Herein are Deemed Established Upon the Trial, said facsimiles were not produced in discovery by the defendants until August 22, 2003. The versions of the facsimiles identified as exhibits numbered 11 (dated May 29, 1997) and 13 (dated December 30, 2002) at the deposition of Sever on December 30, 2002 were obtained from Sever's computer files that had been previously provided to the defendants by Sever and did not state the correct dates of said facsimiles.

4. Note that the claim that Sever drafted to describe his second option, as it appears in the respective Sever facsimiles, can be directly read on the drawing of the second option depicted above without reference to a telescoping frame element:

readily flexible tubular lining 22 is completely filed with a non-compressible fluid, and completely sealed (e.g., the fluid inlet/outlet port in the Tower patent is eliminated).

FIG. 1 is a side cross sectional view of the second option of the Sever facsimiles, in the un-actuated condition with a catheter present;

FIG. 2 is a lateral cross sectional view FIG. 1 of the second option of the Sever facsimiles; FIG. 3 is a cross sectional view of FIG. 2 in the actuated condition with a catheter present; and,

FIG. 4 is a lateral cross sectional view of FIG. 3.

Referring now to FIG. 2, the second option of the Sever facsimiles comprises an outer tubular wall 20 which is generally made of a semi-flexible deformable material. The outer tubular wall 20 is lined with an inner readily flexible tubular lining 22 which is generally formed of a thin layer of high strength polyethylene or other suitable elastic material so as to completely line the interior of the outer tubular wall 20. The inner readily flexible tubular lining 22 generally is longer than the outer tubular wall 20 and the ends are folded back about the outer ends of the outer tubular wall 20 and cemented

---

"a sealed chamber 10 containing only a substantially non-compressible fluid (i.e., a liquid fluorocarbon), further comprising:
an outer body member 20 form[ed] of a flexible, but substantially non-stretchable material; and,
an inner body member 22 formed of a flexible and stretchable (?) material; and,
means for applying mechanical pressure (see arrows in FIG. 3) to the outer surface of said outer body member a fluid into the fluid receiving chamber."

about the ends of the body 10 to form a fluid tight seal about the circumference of the ends of the outer tubular wall 20. Suitable ferrules 24 (not shown) and 26 (not shown) are then sealed about the ends of the outer tubular wall 20 and the turned back sleeve of inner readily flexible tubular lining 22 to secure the whole assembly to a form that can be easily and readily connected to other ferrules such as the ferrule (not shown), thus forming a sealed space between outer tubular wall 20 and inner readily flexible tubular lining 22.

The provision of the inner readily flexible tubular lining 22 completely sealed about both ends of the outer tubular wall 20 forms a fluid-tight sealed space there between, wherein a non-compressible fluid is disposed.

Referring now to FIG. 3, when radial force (applied by e.g., a screw clamp (not shown)) is applied to the outer tubular wall 20, the inner readily flexible tubular lining 22 will be inwardly deformed and completely collapse against catheter 31, throughout approximately half the length of the outer tubular wall 20, totally closing off and sealing the outer surface of catheter 31 against fluid flow from one end to the other. When the radial force is withdrawn from the outer tubular wall 20, the inner readily flexible tubular lining 22 will be outwardly deformed and withdraw from catheter 31, throughout approximately half the length of the outer tubular wall 20, thereby enabling fluid flow from one end to the other.

## Explanation of the Tower Patent

The device of the Tower patent can best be explained by referring to the following drawings:



FIG. 2 is a cross sectional view of the device of the Tower Patent;

FIG. 3 is a cross sectional of FIG. 2 in the actuated condition without a catheter present; and,

FIG. 4 is a cross sectional view taken along line 4--4 of FIG. 3.

Referring now to FIG. 2, the device 10 of the Tower patent comprises an outer tubular semi-flexible body member 20 which is made generally of a polyurethane or other suitable semi-flexible material. The outer tubular semi-flexible body member 20 is lined with an inner tubular flexible lining 22 which is generally formed of a thin layer of high strength polyethylene or other suitable elastic material. Inner tubular flexible lining 22 is longer than outer tubular semi-flexible body member 20 and the ends thereof are folded back about the outer ends of outer tubular semi-flexible body member 20 and

cemented about the ends of device 10 to form an air-tight seal about the circumference of the ends of outer tubular semi-flexible body member 20. Suitable ferrules 24 and 26 are then sealed about the ends of outer tubular semi-flexible body member 20 and the turned back inner tubular flexible lining 22 to secure the whole assembly to a form that can be easily and readily connected to other ferrules such as the ferrule 16 of the catheter to be introduced. But for the provision of inlet/outlet port 28, inner tubular flexible lining 22 is thus completely sealed about both ends of outer tubular semi-flexible body member 20 sufficient to form a substantially fluid-tight space there between. The inlet/outlet port 28 is shown as a tapered fitting for introducing of a standard hypodermic syringe for introducing air into or withdrawing air out of, the fluid-tight space between inner tubular flexible lining 22 and outer tubular semi-flexible body member 20. As shown in FIG. 2, a standard hypodermic syringe 30 is provided for introduce or withdrawing air through the inlet/outlet port 28 into or from the fluid-tight space between outer tubular semi-flexible body member 20 and the inner tubular flexible lining 22.

Referring now to FIG. 3, it will be seen that when air is introduced to pressurize the fluid-tight space between outer tubular semi-flexible body member 20 and inner tubular flexible lining 22; the inner tubular flexible lining 22 will be inwardly deformed and collapsed away from outer tubular semi-flexible body member 20, throughout approximately half the length of outer tubular semi-flexible body member 20, thus totally closing off and sealing flow

7

through the device 10. The device 10, as shown in FIGS. 3 and 4 is totally closed off and prohibits flow of blood or other fluids there through. As may be seen in FIG. 4, when the fluid-tight space between outer tubular semi-flexible body member 20 and inner tubular flexible lining 22 pressurized, inner tubular flexible lining 22 is caused to be collapsed in upon itself sufficient to forms a complete seal within device 10 against any flow of fluid.

When it is desired to permit flow of fluid through device 10, the hypodermic syringe 30 can be retracted to reduce the pressure and to allow the inner tubular flexible lining 22 to be relaxed to its un-pressurized state, as shown in FIG. 2. In this state free flow of fluid is permitted through device 10. When inner tubular flexible lining 22 has been relaxed to its un-pressurized state of FIG. 2, a catheter having a balloon on the end thereof may be readily and easily inserted through the valve body and into the introducing sheath for insertion into the patient for the necessary treatment regimen. Alternatively, of course, the deformation of inner tubular flexible lining 22 may be used to restrict but not totally shut off the flow of fluid through the valve body so that fluid flow may be regulated as well as stopped.

### Explanation of the First Option of the Sever Facsimiles

The first option disclosed in the Sever facsimiles can best be explained by referring to the following drawings:

FIG. 7



FIG. 8

FIG. 8 shows a partial isometric view of the first option.

FIG. 7 shows a partial side sectional view of the device depicted in FIG. 7.

FIG. 7 shows a cutaway partial side view of the first option as disclosed in the Sever facsimiles.

Depicted in FIG. 7 is the arrangement of the disputed invention for selectively restricting the flow of a fluid through the annular space between an elastomeric tube (31) and a catheter (14) disposed within it, as well as selectively restricting lateral movement of the catheter (14) relative to the elastomeric tube (31). The arrangement includes a substantially rigid telescoping tube (34) for supporting the elastomeric tube (31) there within. The rigid telescoping tube (34) further includes an inner tube (32) which further includes a pin (35) disposed on the outer circumference thereof; and an outer tube (33) which further includes an opening therein forming a slot (37) (more

9

clearly shown in FIG. 8), and a plurality of substantially equally spaced stops (36); a first clamping arrangement for fixing one end of the elastomeric tube (31) to the end of the outer tube (33) furthest from the inner tube (32); and, a second clamping arrangement for fixing the other end of the elastomeric tube (31) to the end of the inner tube (32) farthest from the outer tube (33).

The device of the first option operates in the following manner: inner diameter of the elastomeric tube (31) is decreased in direct proportion to the length of the substantially rigid telescoping tube (34) as it is stretched and thereby increased by causing the pin (35) to be placed in each one of the substantially equally spaced stops (36) progressively closer to the end of the outer tube (33) furthest from the inner tube (32). Similarly, the inner diameter of the elastomeric tube is increased in direct proportion to the length of the substantially rigid telescoping tube (34) as it is relaxed and decreased by causing the pin (35) to be placed in each one of the substantially equally spaced stops (36) progressively farther from the end of the outer tube (33) furthest from the inner tube.

FIG. 8 shows a partial isometric view of the novel arrangement of the invention. The relationship between slot (37), stops (36) and pin (35) are depicted with particularity.

The elastomeric tube (31) can be constructed of substantially any known elastomer suitable for medical applications.

Sever's second option is that which defendants seek the Court to believe is the so-called "slight variation" of "Mort Glickman's" Lateral Movement

Controller with an incompressible fluid between the walls", referenced in the Foltz letter. In contemplating FIG. 8, it is inconceivable to Sever how an incompressible fluid could be disposed between the walls thereof, and still function.[5] Otherwise, Sever must await defendants' explanation.

Rather than the explanation of the second option as Sever has correctly described it above, defendants seek to fraudulently convince this Court that the second option (to which defendants allege the phantom application is drawn) is the so-called "slight variation" of "Mort Glickman's Lateral Movement Controller with an incompressible fluid between the walls," referenced in the Foltz letter. Stated otherwise, defendants seek to convince the Court that the second option is merely the *first option* (as Sever has correctly described the first option above) with an incompressible fluid [disposed] between the walls." In contemplating FIG. 8, of the first option; the "walls" (purporting to contain the) "incompressible fluid" referenced in the Foltz letter could only refer to: that volume or space (for purportedly containing an incompressible fluid) bounded by the (incompressible fluid wetted surfaces of) the outer surface of elastomeric tube 31 and the (incompressible fluid wetted surfaces of) the inner surface of outer (telescoping) tube 33 and the (incompressible fluid wetted surfaces of) inner (telescoping) tube 32. First of all, the Court should note that there is no way to provide a fluid-tight seal between the outer wall of the elastermeric tube

---

5.  The Court should note that there is no way to provide a fluid-tight seal between the outer wall of the elastermeric tube and the inner walls of the telescoping member since the telescoping members are open-ended at the respective ends by which they telescope into each other, and thus there would be no way to contain an incompressible fluid.

11

and the inner walls of the telescoping members, since the telescoping members are open-ended at the respective ends by which they telescope into each other, and thus there would be no practicable way to provide a fluid-tight seal there between and thus there could be no practicable way to contain an incompressible fluid there within. Further, by its very nature, the volume of the space between the "walls" of the first option is variable, depending upon which slot 37 (or stop 36) the pin 35 is disposed within. Thus, there is no practicable way in which a fixed quantity[6] of non-compressible fluid having a constant volume can be contained in the variable space between the walls of the "slight variation" of the Foltz letter. Finally, in contemplating the "means plus function analysis" described, *infra*, with respect to the "slight variation;" no reasonable function can be rationalized for disposing an incompressible fluid in the manner as urged by defendants by the Foltz letter. Sever respectfully contends that the forgoing analysis is fatal to defendants' false contention of the "slight variation" alleged in the Foltz letter.

---

6. Sever contends that defendants' "slight variation" scheme would in-fact function to resist extension of the inner telescoping element away from, or collapse of the inner telescoping element, into, the outer telescoping element. For example, when attempting to extend the telescoping elements away from each other, the fixed volume of incompressible fluid would be subjected to a negative pressure, e.g., suction; and this suction would function to resist the extension of the telescoping elements away from each other. On the other hand, when attempting to collapse the telescoping elements towards each other, the fixed volume of incompressible fluid would be subjected to a positive pressure, e.g., pressure; and this pressure would function to resist the collapse of the telescoping elements toward each other (not to mention the loss of incompressible by squeezing it through the open end of the outer telescoping member). Thus, the "slight variation" scheme as set forth by defendants in the Foltz letter would work to counteract the intended function of the inner and outer telescoping tubular elements, e.g., unimpeded extending from each other and/or unimpeded collapsing toward each other.

## Defendants' Contention is Implausible Under the Means Plus Function Comparison

In the patent law the concept of means plus function refers to the broadest manner in which an element of an apparatus can be described or expressed or claimed. As noted above, more than a year after it was due, defendants offered up the Foltz letter in feeble support for their false contention of Glickman's inventorship. In an attempt to reconcile facts which they have not been able to avoid, defendants now apparently contend that Sever is the inventor of only a "slight variation" of "Mort Glickman's" Lateral Movement Controller with an incompressible fluid between the wall." They apparently further contend that the "slight modification" is memorialized in the phantom application that they have conspicuously failed to provide in response to Sever's discovery requests.

## First Option Disclosed in the Facsimiles

At respective second pages of both of the facsimiles, Sever discloses:

> "The same functions could be achieved, while at the same time, eliminating the cumbersome "means for introducing a fluid" structure of Tower, by either of *at least* Two (2) design changes. The first is the arrangement which includes the *telescoping member*, on which I have already drafted an application."

The function of controlling the lateral and rotational movement of a catheter here is accomplished solely by the means of an arrangement that includes a telescoping member[7].

---

7. Significantly there is no mention of an incompressible fluid in regard to the first option in either of Sever's facsimiles. The only reference to

13

## Second Option Disclosed in the Facsimiles

As noted also in the respective second page both facsimiles, the second option that Sever proposed was:

> "...The same functions could be achieved, while at the same time, eliminating the cumbersome "means for introducing a fluid" structure of Tower, by either of *at least* Two (2) design changes. The first is the arrangement which includes the telescoping member, on which I have already drafted an application. The second design proposal can be best illustrated by the following claim language:
>
>   a *sealed* chamber containing only a substantially *non-compressible fluid* (i.e., a liquid fluorocarbon), further comprising:
>     an outer body member form of a flexible, but substantially non-stretchable material; and,
>     an inner body member formed of a flexible and stretchable (?) material ; and,
>   means for applying mechanical pressure to the outer surface of said outer body member a fluid into the fluid receiving chamber.
>
> In the latter design, **by merely applying pressure to the out surface of the outer body member,** the same pressure would be transmitted through the non-compressible fluid within the sealed chamber so as to compress the inner body member against the surface of the catheter sufficient to provide a blood tight seal and substantially restraining its movement relative to the sealed chamber." (Bold emphasis added.)

Similar to the case of the first option, there is no reference in the second option to the telescoping structure of the first option. Thus, although the respective means are designed to perform the same function, they are separate

---

incompressible fluid is made solely in regard to the second option proposed in the facsimiles. Thus, although the respective means are designed to perform the same function, they are separate and distinct from each other and constitute separate and distinct inventions.

14

and distinct from each other and constitute separate and distinct inventions. Stated otherwise, if the two separate means (e.g., the telescoping structure of the first option and the incompressible fluid of the second option) were combined in the same invention, each would perform the same function (e.g., control of the lateral and rotational movement of a catheter). Each such means would be redundant with respect to the other; adding additional structure to the invention without adding any addition function[8]. Such a modification would not make sense from an inventor's prospective.

### Phantom Application

As noted above, in the now infamous Foltz letter, Feldman purported to enclose with the letter an application (e.g., the "phantom application") drawn to a "slight variation" of "Mort Glickman's Lateral Movement Controller with an incompressible fluid between the wall." Since defendants have not provided a copy of the phantom application as they rightfully should have pursuant of Sever's discovery requests, Sever has only the disclosure of the "slight variation" of "Mort Glickman's Lateral Movement Controller with an incompressible fluid between the wall" language on which to base an analysis. However, Sever speculates that this phantom invention merely purports to combine separate and distinct means to perform a single function in a single invention. As noted above, such a scheme would add redundant structure to the phantom invention without adding addition function or enhancing a

---

    8.  Indeed, intuitively, it would seem the separate means if combined in the "slight variation" alleged in the Foltz letter functions would provide respective functions that operate counter to each other.

common function. Indeed such a combination of separate and distinct means in a single device would seem to negate[9] the overall intended common function. Specifically, a telescoping means combined with an incompressible fluid means (disposed between the walls of the telescoping means) would seem to work against each other in performing the commonly intended function. It would simply not make any sense to make such a modification.

## Conclusion

WHEREFORE, the plaintiff, Frank Sever, Jr., respectfully requests that this Honorable Court grant Plaintiff's Motion for Sanctions Because of Defendants Failure to Comply with this Court's Order Dated February 10, 2004 for the reasons cited above, and that this Court should compel defendants to produce all overdue discovery, including but not limited to the phantom application.

Respectfully submitted,

*/s/ Peter P. Mitrano*

Peter Paul Mitrano (admitted *pro hac vice*)
Ct. Fed. Bar No.: 23733
Suite 201
581 Boylston Street
Boston, Massachusetts 02116
(617) 236-5655

Local Connecticut Counsel:

---

9. E.g., the two separate and distinct means [intended to provide a common function] would seem to work against each other and subtract from the commonly intended function rather that add to it.

16

                                             _____
                                             Frank B. Velardi, Jr.
                                             Ct. Fed. Bar No.: 07893
                                             Lasala, Walsh, Wicklow & Velardi
                                             168 Bradley Street
                                             Post Office Box 1302
                                             New Haven, Connecticut 06505-1302
                                             (203) 785-8929
                                             (203) 776-4663 (facsimile)

                                             Attorneys for Plaintiff
                                             Frank Sever, Jr.

Dated: April 28, 2004.

## Certificate of Service

I hereby certify that I caused a copy of the foregoing Memorandum in Support of Plaintiff's Motion for Sanctions Because of Defendants Failure to Comply with this Court's Order Dated February 10, 2004 to be deposited with the United States Postal Service, postage prepaid for first-class mail, on this 28th day of April 2004 addressed to Joseph L. Clasen, Esquire and James M. Ruel, Esquire, Robinson & Cole LLP, Financial Centre, 695 East Main Street, Post Office Box 10305, Stamford, Connecticut 06904-2305.

_____
Peter Paul Mitrano