# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT
## Hartford

| | | |
|---|---|---|
| FRANK SEVER, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.  3:02cv722 (AVC) |
| | ) | |
| MORTON G. GLICKMAN, *et al.*, | ) | Date of this Pleading: July 14, 2004 |
| | ) | |
| Defendants. | ) | |

## Plaintiff's Opposition to Defendants' Motion in Limine on Damages

Plaintiff, Frank Sever, Jr. (hereinafter sometimes referred to as "Sever"), by and through his undersigned attorneys, states Plaintiff's Opposition to Defendants' Motion in Limine on Damages[1] as follows:

In opposition to remarks under the heading: "Sever Has No Substantial Pecuniary Loss" on page 3 on the defendants' Memorandum of Law in Support of Defendants' Motion in Limine Regarding Proof of Damages and defendants' comment on the first page on the defendants' Memorandum of Law in Support of Defendants' Motion in Limine Regarding Proof of Damages that "Sever alleges that he relied upon the statement of Feldman and Glickman would not seek a

---

[1]     Pursuant to the Rules of the United States District Court for the District of Connecticut, plaintiff respectfully requests oral argument.

patent and would not file a patent application", Sever states that Feldman's

fraud in this case is pervasive and predates the tape, as illustrated by the

following excerpt from the tape:

> SEVER:    And that's -- that's these ah, these,
> Delcath ah, ah catheter patents.  And ah, .
> I'm,/I'm a little gun shy about this, Steve.
> Because I think of at the very least if, if I
> did the inventing on these things then --
> and your filing -- and your filing a
> declaration or an oath on these things
> saying that somebody else has done it,
> then, then that's unethical at the very
> least.  And, and, and I don't do unethical
> things.

> FELDMAN: Yeah.

> SEVER:    And, I'm getting a little god damn gun shy
> about this.

> FELDMAN: Well, which one are you talking about?

> SEVER:    I'm talking about the, ah, the last one in
> particular that you asked for the drawings
> on, which, which – ah, which I thought
> died on the vine?   The one ah, the
> telescoping ah, ah, frame or the
> telescoping tube catheter.  Do you know
> that -- do you know which one I'm talking
> about?

> FELDMAN: Yeah, you wrote that -- you charged me for
> that, Frank.

> SEVER:    Well, ah, ah, ah -- yeah but but ah Steve,
> (laugh) you don't understand.  What we're
> -- what we're doing here -- you know, we
> had this discussion I guess about two or
> three months ago or a couple of months
> ago when the, when the situation first
> arose.  I said I don't feel comfortable, ah,
> ah, ah being the inventor on these things.
> And do you remember?  You remember --

FELDMAN:    Sure.

SEVER:      -- when I said well, maybe all, all -- you know, you said well they're not interested in it.  **And I said well, maybe I should file on it.  And you went ah -- you said well, no you'll get me in trouble.**  See, here's what the situation is in a nutshell, Steve.  When you file -- when you file a patent application you have to disclose who the inventors are, and, and, if if you don't, you're tampering with some pretty, pretty heavy stuff.  You know you can't be -- you know, it's like filing a false affidavit or a false oath.

FELDMAN:    Well, would you feel more comfortable if we don't file that one?

SEVER:      Yes.  Absolutely.  That, that scares the shit out of me, Steve, because I don't want to get involved in anything unethical.

FELDMAN:    Well, --

SEVER:      And that's basically the bottom line.

FELDMAN:    Okay.  Well, why didn't you mention this to me a long long time ago?

SEVER:      Well, --

FELDMAN:    Because if you had I would have said let's forget about that one and ended it at that.

SEVER:      Okay.

FELDMAN:    You see, you put me in a little bit of a bind here.

SEVER:      Yeah, but the point, the point being, Steve is that I thought that it did die on the vine, and now you're, you're resurrecting it.

> FELDMAN:  No, no, no.  It never died on the vine.  See
> look, --"  (Bold emphasis added.)

Sever respectfully submits that the tape speaks for itself.  It is clear from the foregoing excerpt, that when Feldman made the misrepresentation to Sever that his clients were not interested in the invention, that Sever fully intended to file an application on the invention in his own right.  However, when Feldman deceitfully responded that "you'll get me in trouble", it was at this point that Sever forbore filing on the invention.  Thus, it is clear that, but for, Feldman's plea, and Sever's sense of honor in wishing not to "get Feldman in trouble with his client", Sever would have indeed filed on the invention.

Also see *Evans Cooling Systems* v. *General Motors Corp.*, 125 F.3d 1448, 1453, 1454 (Fed. Cir. 1997) ("In *Martin*, Martin's employer stole Martin's invention and filed an application on it and disclosed it to a third party.  74 F.2d at 952-53.  After learning of his employer's activities, Martin filed his own application .  .  . Evans is not without recourse if GM in fact misappropriated his invention.  Evans would have an appropriate remedy in state court for misappropriation of a trade secret."); and *Smith & Egge Mfg. Co.* v. *Webster*,  87 Conn. 74, 81-82, 84, 86 A. 763, 766, 767 (1913) ("the court has found that the defendant not only wrongfully applied for a patent in his own name as inventor, but at the time when he converted the model .  .  . On the question of damages, the defendant's claim is that the action for the conversion of the model and that the primary measure of damages is the value of the property .  . . we think that the complaint lays a sufficient foundation for proving and awarding as damages the plaintiff's loss of profit on its contract.")

4

In opposition to defendants' arguments under the general heading of "Sever's Damage Evidence Is Speculative" on page 4 on the defendants' Memorandum of Law in Support of Defendants' Motion in Limine Regarding Proof of Damages, Sever states that defendant Delcath's Web site contains statements upon which Sever has based his damages calculation. It is noted, that despite that Sever sought discovery on the issue of damages, defendants stonewalled discovery and provided none. See *Donovan* v. *Bierwirth,* 754 F.2d 1049, 1056 (2nd Cir. 1985) ("*cf. Armory v. Delamirie*, 93 Eng. Rep. 664 (1722) (the 'Chimney Sweep's Jewel Case') (plaintiff bailed jewel with defendant, who failed to return it: *held* 'unless the defendant . . . produce the jewel, and shew it not to be of the finest water, [the jury] should presume the strongest against him, and make the value of the best jewels the measure of [plaintiff's] damages'. This is nothing more than application of the principle that, once a breach of trust is established, uncertainties in fixing damages will be resolved against the wrongdoer. See *Leigh v. Engle*, 727 F.2d at 138; *McMerty v. Herzog*, 710 F.2d 429, 431 (8th Cir.1983).)"

For example, Sever's interrogatory no. 4 and Delcath's response are as follows:

"Interrogatory No. 4.

"4.     Identify the basis for the Delcath Business Model.

"Defendant objects to the interrogatory as being vague, unduly broad, indefinite, burdensome, and requesting attorney client privileges and work product information.

Sever's interrogatory no. 7 and Delcath's response are as follows:

"Interrogatory No. 7.

"7.     Identify any and all uses that you anticipate for the invention contained in United States Patent Numbered 5,897,533.

"Defendant objects to the interrogatory as being unduly broad, indefinite, burdensome, and requesting attorney client privileges and work product information.    However subject thereto, Defendant answers the same as follows:
"None."

Sever's interrogatory no. 8 and Delcath's response are as follows:

"Interrogatory No. 8.

"8.     Identify your cost of producing the invention contained in United States Patent Numbered 5,897,533 and the profit you anticipate making from your use of the invention contained in United States Patent Numbered 5,897,533.

"Defendant objects to the interrogatory as being unduly broad, indefinite, burdensome, and requesting attorney client privileges and work product information.    However subject thereto, Defendant answers the same as follows:
"None."

Sever's interrogatory no. 9 and Delcath's response are as follows:

"Interrogatory No. 9.

"9.     Identify all agreements, including but not limited to the payment of any money to anyone, that you have made related to invention contained in United States Patent Numbered 5,897,533.

"Defendant objects to the interrogatory as being unduly broad, indefinite, burdensome, and requesting attorney client privileges and work product information.    However subject thereto, Defendant answers the same as follows:

"None."

Sever's request for production of documents no. 23 and Delcath's response are

as follows:

> "23. Any and all documents related to the
> Delcath Business Model.
>
> "23. Defendant objects to the request for
> production as being unduly broad, indefinite, and
> burdensome, and requesting attorney client privileged
> and work product information.  However, Defendant
> responds as follows:
> Subject to the above, documents will be
> produced if relevant to the issues in this matter."

Sever's request for production of documents no. 24 and Delcath's response are

as follows:

> "24. Any and all documents related to your
> plans to use the invention stated in United States
> Patent Numbered 5,897,533.
>
> "24. Defendant objects to the request for
> production as being unduly broad, indefinite, and
> burdensome, and requesting attorney client privileged
> and work product information.  However, Defendant
> responds as follows:
> Subject to the above, there are no documents."

Sever's request for production of documents no. 25 and Delcath's response are

as follows:

> "25. Any and all documents related to your
> costs to produce and/or manufacturer the invention
> stated in United States Patent Numbered 5,897,533.
>
> "25. Defendant objects to the request for
> production as being unduly broad, indefinite, and
> burdensome, and requesting attorney client privileged
> and work product information.  However, Defendant
> responds as follows:
> Subject to the above, there are no documents."

Sever's request for production of documents no. 26 and Delcath's response are as follows:

> "24.  Any and all documents related to your anticipated selling price for the invention stated in United States Patent Numbered 5,897,533.
>
> "24.  Defendant objects to the request for production as being unduly broad, indefinite, and burdensome, and requesting attorney client privileged and work product information.  However, Defendant responds as follows:
> Subject to the above, there are no documents."

It is respectfully submitted that defendants lack of responses to Sever's discovery prevent the defendants from complaining about the calculation of Sever's damages and thus any uncertainties in fixing damages should be resolved against the defendants pursuant to *Donovan* v. *Bierwirth,* 754 F.2d 1049, 1056 (2nd Cir. 1985).

In defendant Delcath's article "At a Glance," published by Redington, Inc., defendant Delcath made the following disclosures:

"FOCUS POINTS

*(1) Delcath's platform technology provides organ specific delivery of potent FDA-approved drugs directly to the tumor, increasing the potential efficacy of the drug.*
*(2) The company will begin Phase III multi-center clinical trials later this year.*
*(3) FDA approval is expected as early as 24 months after the start of the Phase III trials.*
*(4) The National Cancer Institute (NCI) has announced plans to study the Delcath system as a less invasive way to provide regional drug therapy to patients with terminal cancer of the liver.*
*(5) The addressable worldwide patient population for all types of liver cancer (primary and metastatic) is estimated to approach 1.7 million individuals.*

*(6) Delcath's two top executives have participated in the startup of several successful life science companies, including Agouron Pharmaceuticals (sold to Pfizer), Betagen Biotech Diagnostics (sold to Amoco Oil) and Nexell Therapeutics (NEXL).*

## HIGHLIGHTS

• The company's Phase I/II trials suggest the Delcath system has superior potential over other therapeutic treatments in prolonging the survival of liver cancer patients and improving their quality of life.

• Delcath's Phase III clinical trials, scheduled to start later this year, will administer doxorubicin to 61 patients with malignant melanoma that has spread to the liver. The endpoint will be statistically significant survival against control.

• Because toxicity can be reduced, treatment costs with Delcath's delivery system are expected to be considerably less than those associated with the current standard of care for cancer in the liver.

• Cancer in the liver, which is invariably fatal, is the third most common form of cancer worldwide, causing 1.2 million deaths yearly.  In the US primary and metastatic liver disease accounts for up to 10 percent of all cancer deaths.

• The NCI estimates that five-year survival rates for patients with liver cancer are usually less than 10 percent.

• The company expects to enter into partnership agreements for treatment of organs other than the liver and for indications other than cancer.

• Delcath holds 10 key patents (US and overseas) with protection covering both the device and method of treatment.

• The patented Delcath System is a single-use disposable kit.

• At 3/31/01 the company had cash and cash equivalents of approximately $4.9 million.

• The company's chairman and chief technical officer, Sam Herschkowitz, MD is a board certified psychiatrist and neurologist.  CEO M.S. Koly is a former senior manager at Abbott Labs and Beckton-Dickinson where he was president of BD's respiratory systems unit.

• Early investors in the company include J&J Development Corp. and Japan's Nissho Corp.

• Each of the 1.2 million units issued in the company's October 2000 IPO consist of one share of common stock and one warrant to purchase one share of common stock at $6.60. The shares and warrants will become separately tradable on October 19, 2001, or an earlier date to which the underwriter consents. The Nasdaq SmallCap Market symbol for the common stock will be DCTH; the warrant will trade as DCTHW.

## DELCATH DRUG DELIVERY

In a world growing accustomed to advances in the fields of protein fusion and guided missile therapies, Delcath's system appears deceptively simple. It utilizes the science of isolated perfusion, a method of drug delivery whose history of usage dates back roughly 40 years.

Delcath's proprietary system incorporates advances in biomedical filtering and thin wall plastics technology, leading to a major advance in perfusion techniques. The net advantage is the clinician's ability to substantially intensify dosing while limiting systemic toxicity. Unlike any other

Delcath Systems, Inc.
(NASDAQ: DCTHU)
52-Week Range: $1-6.56
Recent Price: $2.77
Common Shares Outstanding: 3.9 million
Approx. Float: 1.2 Million
Approx. Market Cap: $11 million
Cash at 3/31/01: $4.9 million
Fiscal Year Ends: December 31
Published: August 2001
at a glance

*Published by Redington, Inc. for investment professionals. All rights reserved.*

Recent Events: *Delcath raised $7.2 million in October 2000 IPO; Phase III multi-center clinical trials for liver cancer to start in 200l, giving this public company the clinical lead in the category; initial indications will address $3.5 billion US market; National Cancer Institute to conduct dose ranging trial with melphalan; strategy adopted to seek partners for other organs/body regions, with highest priorities being the*

*pancreas, lungs, and lower limbs; clinical data published in leading medical journals.*

*The information and statistical data contained herein may contain forward-looking statements that reflect the company's intentions, expectations or beliefs concerning future events, including, but not limited to, expectations with respect to FDA approval of new products, technology and product development milestones, the ability of the company to leverage its product development and negotiate favorable collaborative agreements, the commencement of sales and the sufficiency of the company's cash flow for future liquidity and capital resource needs. We do not undertake to advise you as to any change in this information. The forward-looking statements are qualified by important factors that could cause actual results to differ materially from those in the forward-looking statements. In addition, significant fluctuations in quarterly results may occur as a result of varying milestone payments and the timing of costs and expenses related to the company's research and development programs. This is not a solicitation of any offer to buy or sell. Redington, Inc. acts as the company's investor relations counsel and it, its employees or members of their families may from time to time own an equity interest in companies mentioned herein.*

## National Cancer Institute

The NCI collaboration with Delcath results from roughly six years of research by NCI using a major surgical procedure to accomplish isolation of the liver for a similar treatment with melphalan.

The NCI's most recent studies with isolated liver perfusion techniques have involved a lengthy (6-7 hour) surgical procedure in which the right and left lobes of the liver are severed from their diaphragmatic attachments and various tubes and clamps are installed as part of a complex procedure to achieve complete vascular isolation of the organ, thus limiting systemic absorption of the anticancer drug.

The mean hospital stay for this surgery is reported to be 11 days.

The NCI expects the Delcath system, which is far less invasive than techniques used earlier by NCI surgeons,

will make regional therapy available to much wider number of patients for whom there is no other available treatment. More importantly, the Delcath treatment is repeatable, so patients who respond to the therapy can continue to receive treatments to keep their tumors in check.

. . . modern day drug delivery system, Delcath's is directly organ specific.

It utilizes a system of catheters and filters to isolate an organ and gain control of its vascularity.

The catheters are custom manufactured to Delcath's patented specifications. The pump is a standard system found in most hospitals, and the charcoal filtering media is especially effective trapping aromatic hydrocarbons. Most chemotherapeutic agents are of the aromatic compound variety.

The first target organ is the liver for treatment of cancer. The company expects to gain initial FDA approval for melanoma that has spread, or metastasized, to the liver, the subject of its pivotal Phase III trials which are scheduled to start later this year.

The entire Delcath procedure is minimally invasive and takes about 2.5 hours, with patients under local anesthesia. For FDA observation purposes, clinical trial patients will spend the night in the hospital. Once FDA approved, Delcath expects the procedure to be done on an outpatient basis.

The Delcath system was originally tested at Yale Medical School under the direction of two oncologists and an interventional radiologist.

The purpose of the company's Phase I/II studies was to determine the safety of the system and it's utility with different chemo agents against different cancer types at different doses.

These studies, along with additional laboratory studies, helped rule out certain drugs and identify doxorubicin as the most likely cancer drug in treating malignant melanoma tumor cells in the liver.

In the last segment of the Phase II trial, 60-80 percent of a small group of melanoma patients achieved significant tumor reduction versus control.

A key concept to understand is that it is the cancer drug, not Delcath's system, that is killing the cancer cells. The Delcath device facilitates safe delivery of higher doses of the anticancer agent, often 2-8x higher

than the dose normally considered acceptable to the patient if delivered intravenously, depending on the chemotherapeutic agent.

## PHASE I/II RESULTS

Conducted with 44 patients, these studies sought to validate the fundamental functionality of the Delcath system and establish its safety in both delivering and filtering out extremely high doses of FDA-approved anticancer agents.

Twenty-one of the patients were diagnosed with primary liver cancer or cancers that had metastasized to the liver. These patients were treated in groups with escalating doses of doxorubicin. The other 23 patients were treated with escalating doses of 5-FU, another cancer agent.

Results showed that the Delcath system extracted or filtered out approximately 70-85 percent of the chemo drugs leaving the liver. This confirmed that the system delivers extremely high doses of cancer agents safely to the cancer site, and its ability to remove the majority of the drug.

The study also showed the Delcath system versus conventional intravenous delivery can:

(1) Permit more cancer drugs to get to the tumor site; and

(2) Allow less chemo agent to enter general circulation than if the same dose was delivered intravenously.

Anecdotally, investigators observed reduction in tumor size and increased survival time of those treated with the Delcath system versus those treated conventionally.

## PHASE III ENDPOINTS

The Phase III protocol accepted by the FDA calls for treating 122 patients diagnosed with malignant melanoma that has spread to the liver. One half of the patients will be treated with doxorubicin using the Delcath system and one half will be treated with a conventional drug therapy delivered intravenously.

Patients assigned to the Delcath arm of the trial will undergo an average of four procedures. Under the protocol, patients may receive subsequent Delcath

13

procedures if a CAT scan has shown stabilization or shrinkage of the tumor.

The endpoint will be time of survival. The Phase III trial must demonstrate that patients treated with the Delcath system experience statistically significant longer survival versus their counterparts in the control group.

The company expects to complete the trial and receive FDA approval within 24 months of the first patient enrollment. As the trials progress, safety or preliminary efficacy data may be the subject of professional articles or presentations by the principal investigators.

## MARKET OPPORTUNITY/ASSUMPTIONS

The current cost to treat liver cancer in the US with aggressive chemotherapy (the standard of care) at one of the comprehensive cancer centers in the US is as high as $170,000 per patient, with a major portion of the cost required for treating side effects and hospitalization. Treatment with the Delcath system is expected to be about two-thirds less.

Delcath's business model is based on treating approximately 2000 patients during the first two years of product marketing. On that basis, revenue for the two-years would total roughly $32 million. In the third year, the company plans systems sales for approximately 5,400 patients, generating revenue of roughly $87.0 million. At that level, the company will have achieved a 2.5 percent penetration of its addressable US market.

## LAUNCH STRATEGY

The initial US market will be the nation's 39 Comprehensive Cancer Centers where the majority of life-threatening cancers are treated.

By the time of the product's approval, approximately 25 percent of the centers will have experienced the Delcath system, having performed Phase I,II, or III clinical trials. A sales staff of six can adequately service all 39 Comprehensive Cancer Centers.

As US distribution expands to the nation's roughly 600 major hospitals (500 beds or more) less than 15 additional sales people will be required.

The company anticipates foreign sales will be through partners. Nissho, an early stage investor in the company, may handle distribution in Asian markets.

The reimbursement prospects for the Delcath System appear favorable based on current assessments of Medicare and private payer requirements.

First, should the system receive FDA approval it will have been judged to hold a therapeutic advantage over intravenous chemotherapy for liver cancer. It will have established clinical superiority and would gain stature as a standard of care.

Second, there will be a potentially large cost savings for payers. The cost of aggressive chemotherapy strategies such as those typically employed in the treatment of primary and metastasized liver cancer is up to $170,000 per patient, including drugs, physician care and hospital stays at a comprehensive cancer center.

By comparison, the 'all in' costs of treating a patient with the Delcath system are expected to be about $48,000, a considerable savings over the current standard of care. This is computed on the basis of using four Delcath kits per patient (one for each of four procedures) at $4000 each for a total kit cost of $16,000, plus $32,000 in physician, drug, facilities and related costs.

It is expected the Delcath therapy will be performed under outpatient procedures.

*For additional information, contact* Redington, Inc. • CT 203 222-7399 • NY 212 926-1733 • info@redingtoninc.com

Delcath Systems, Inc. • 203 323-8668 • www.delcath.com

### YEAR 3 US PROJECTIONS

Addressable Patients 222,000
Delcath Penetration 2.5%
Patients Treated 5,432
Delcath Kits (4 ea. Patient) 21,728
Price per Kit $4,000
Total Gross Revenue $86.9 MM"

Thus, as stated in the above-quoted text, defendant Delcath based its business model upon the following assumptions. FDA approval of Phase III

trials was expected at the end of year 2002.  Based solely upon the treatment of terminal liver cancer patients, defendant Delcath expected to treat 2000 patients in the first two years (years 2003 and 2004) and 5400 patients in the third year after FDA approval (year 2005).  Thus, the expected total for the first three years of operation is 9400 patients treated.  United States Patent 5,897,533 to defendant Glickman was issued in April 1999.  The end of its term expires (1997 + 20) on September 2017.  After 2005, twelve years of the patent's term will remain.  Conservatively assuming that the number of patients treated after year 2005 levels out at about 5400 per year, then the number of patients treated for that period will be 64,800 patients (5400 x 12).  Thus, the total of number during the entire term of the patent would be 74,200 (64,800 + 9400).  It should also be noted that presumably the system is equally applicable to the treatment of other forms of cancer such as kidney cancer and other tumors; the calculations stated herein are very conservative and are solely predicated upon the treatment of only liver cancer.

The device disclosed in United States patent 5,161,773 issued to Allen J. Tower of Numed, Inc., is a device similar to the instant invention.  Based upon a minimal estimate of the expected cost of device of United States patent 5,897,533 of $25.00; assuming the device of United States Patent 5,161,773 markets for a minimal of $50.00; assuming that one such device would be required for each kit produced by defendant Delcath and that as noted above, four kits are required for every patient and that each kit was disposed after a single use; and, based upon the treatment of 74,200 patients, a total of at least

(74,200 x 4) 296,800 kits will be sold and the total amount of money earned over the term of the invention would be at least $14,840,000.00 (296,800 x $50.00).

In addition, for further purposes of discussion, there is a value predicated upon the sale of the invention being included in the Delcath system based on the Delcath Business Model, for example, assume that a Delcath system price is approximately $4,000.00 and that the minimum price as a component of said $4,000.00 for the invention is at least $50.00; assume that 16,000 Delcath systems are sold during the first two years or marketing commencing in 2004 and that an additional 21,000 Delcath systems are sold per year thereafter, assume that the life of the patent of the subject invention will end in 2017, and therefore assume that there could be at least (21,000 x 12 + 16,000) 268,000 Delcath systems sold during the life of the patent; based on the above-stated minimum component price of $50.00 per invention times said 268,000, the total price of the invention as a component of the Delcath systems sold is the total sum of at least (268,000 x $50.00) $13,400,000.00 (before any present value calculations) over the life of the patent.  Assuming that the legitimate costs to manufacturer the invention are 50 percent of the price, the total value of the invention is at least $6,700,000.00 (before any present value calculations).

The projected value of the invention based upon the above-stated assumptions (8,000 x ($50.00 x 50%) $25.00 = $200,000.00 and 21,000 x

($50.00 x 50%) $25.00 = $525,000.00) (reduced to present value assuming a two percent discount rate after adjusting for inflation) is calculated as follows:

| Year | Discount Factor | | | | Payment | | Present Value |
|------|-----------------|---|--------|---|-----------|---|---------------|
| 2002 | | | | | $0.00 | = | $0.00 |
| 2003 | $(1/(1+0.02))^1$ | = | 0.9803 | x | $0.00 | = | $0.00 |
| 2004 | $(1/(1+0.02))^2$ | = | 0.9611 | x | $200,000.00 | = | $192,220.00 |
| 2005 | $(1/(1+0.02))^3$ | = | 0.9423 | x | $200,000.00 | = | $188,460.00 |
| 2006 | $(1/(1+0.02))^4$ | = | 0.9238 | x | $525,000.00 | = | $484,995.00 |
| 2007 | $(1/(1+0.02))^5$ | = | 0.9057 | x | $525,000.00 | = | $475,492.50 |
| 2008 | $(1/(1+0.02))^6$ | = | 0.8880 | x | $525,000.00 | = | $466,200.00 |
| 2009 | $(1/(1+0.02))^7$ | = | 0.8706 | x | $525,000.00 | = | $457,065.00 |
| 2010 | $(1/(1+0.02))^8$ | = | 0.8535 | x | $525,000.00 | = | $448,087.50 |
| 2011 | $(1/(1+0.02))^9$ | = | 0.8368 | x | $525,000.00 | = | $439,320.00 |
| 2012 | $(1/(1+0.02))^{10}$ | = | 0.8203 | x | $525,000.00 | = | $430,657.50 |
| 2013 | $(1/(1+0.02))^{11}$ | = | 0.8043 | x | $525,000.00 | = | $422,257.50 |
| 2014 | $(1/(1+0.02))^{12}$ | = | 0.7885 | x | $525,000.00 | = | $413,962.50 |
| 2015 | $(1/(1+0.02))^{13}$ | = | 0.7730 | x | $525,000.00 | = | $405,825.00 |
| 2016 | $(1/(1+0.02))^{14}$ | = | 0.7579 | x | $525,000.00 | = | $397,897.50 |
| 2017 | $(1/(1+0.02))^{15}$ | = | 0.7430 | x | $525,000.00 | = | $390,075.00 |

Total present value of invention of at least the sum of   =   $5,612,515.00

Total punitive damages claimed of at least the sum of   =   $5,000,000.00

Grand total damages of at least the sum of          =   $10,612,515.00

It is respectfully submitted that defendants are equitably estopped to deny the validity of the forgoing calculation by their "At a Glance" article which has been notoriously posted on the internet.    See, e.g., *Kosakow* v. *New Rochelle Radiology Associates, P.C.*, 274 F.3d 706 (2nd Cir. 2001):

> "The doctrine of equitable estoppel is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct.  See *In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 999 (2d Cir. 1996).  Under federal law, a party may be estopped from pursuing a claim or defense where: 1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe that the other party will rely upon it; 2) and the other party reasonably relies upon it; 3) to her detriment. See *Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 59, 102 S. Ct. 2218, 2223 (1984) (citing Restatement (Second) of Torts § 894 (1979)); *Buttry v. Gen. Signal Corp.,* 68 F.3d 1488, 1493 (2d Cir. 1995).  Whether equitable estoppel applies in a given case is ultimately a question of fact. *Bennett v. United States Lines, Inc.*, 64 F.3d 62, 65 (2d Cir. 1995)."

Sever further notes that in *Gelston* v. *Hoyt*, 16 U.S. 246, 325 (1818), the Supreme Court explained:

> "There is no law of the United States, which interferes with, or touches, the question of damages. It is a question depending altogether upon the common law . . . ."

In *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Devon Bank*, 123 F.R.D. 568, 572-573 (Ill. 1988), the court restated the following rule:

> "'As a general proposition, the law imposes upon a party, injured from another's breach of contract or tort, the active duty of making reasonable exertions to render the injury as light as possible.  If, by this

> negligence or wilfulness, he allows the damages to be
> unnecessarily enhanced, the increased loss, that
> which was avoidable by the performance of his duty,
> falls upon him.'"

In *Story Parchment Co.* v. *Paterson Parchment Paper Co.*, 282 U.S. 555, 563

(1931), the Supreme Court stated in part that:

> "Where the tort itself is of such a nature as to
> preclude the ascertainment of the amount of damages
> with certainty, it would be a perversion of fundamental
> principles of justice to deny all relief to the injured
> person, and thereby relieve the wrongdoer from
> making any amend for his acts. In such case, while
> the damages may not be determined by mere
> speculation or guess, it will be enough if the evidence
> show the extent of the damages as a matter of just and
> reasonable inference, although the result be only
> approximate. The wrongdoer is not entitled to
> complain that they cannot be measured with the
> exactness and precision that would be possible if the
> case, which he alone is responsible for making, were
> otherwise. *Eastman Co.* v. *Southern Photo Co.*, 273 U.
> S. 359, 379, 47 S. Ct. 400, 71 L. Ed. 684."

Also see *Dupl*t*e Corp.* v. *Triplex Safety Glass Co. of North America*, 298 U.S.

448, 458 (1936) ("He is the victim of a tort, free at his own election to adopt

what will help and discard what will harm."); and *Westinghouse Electric &*

*Manufacturing Co* v. *Wagner Electric & Manufacturing Co*, 225 U.S. 604, 614

(1912) wherein the Supreme Court stated:

> "(a) Where the infringer has sold or used a
> patented article, the plaintiff is entitled to recover all of
> the profits.
> "(b) Where a patent, though using old elements,
> gives the entire value to the combination, the plaintiff
> is entitled to recover all the profits. *Hurlbut* v.
> *Schillinger*, 130 U. S. 472, 32 L. ed. 1016, 9 Sup. Ct.
> Rep. 584.

"(c) Where profits are made by the use of an article patented as an entirety, the infringer is liable for all the profits 'unless he can show--and the burden is on him to show--that a portion of them is the result of some other thing used by him.' *Elizabeth* v. *American Nicholson Pav. Co.* 97 U. S. 127, 24 L. ed. 1002."

Thus, if the ultra conservative assumptions are modified so that it is assumed that of the $4,000.00 price per kit, the sum of $3,500.00 is profit, Sever's claim for damages would be as follows:

| Year | Discount Factor | | | Payment | Present Value |
|------|-----------------|---|---|---------|---------------|
| 2002 | | | | $0.00 = | $0.00 |
| 2003 | $(1/(1+0.02))^1$ | = | 0.9803 | x        $0.00 = | $0.00 |
| 2004 | $(1/(1+0.02))^2$ | = | 0.9611 | x $28,000,000.00 = | $26,910,800.00 |
| 2005 | $(1/(1+0.02))^3$ | = | 0.9423 | x $28,000,000.00 = | $26,384,400.00 |
| 2006 | $(1/(1+0.02))^4$ | = | 0.9238 | x $73,500,000.00 = | $67,899,300.00 |
| 2007 | $(1/(1+0.02))^5$ | = | 0.9057 | x $73,500,000.00 = | $66,568,950.00 |
| 2008 | $(1/(1+0.02))^6$ | = | 0.8880 | x $73,500,000.00 = | $65,268,000.00 |
| 2009 | $(1/(1+0.02))^7$ | = | 0.8706 | x $73,500,000.00 = | $63,989,100.00 |
| 2010 | $(1/(1+0.02))^8$ | = | 0.8535 | x $73,500,000.00 = | $62,732,250.00 |
| 2011 | $(1/(1+0.02))^9$ | = | 0.8368 | x $73,500,000.00 = | $61,504,800.00 |
| 2012 | $(1/(1+0.02))^{10}$ | = | 0.8203 | x $73,500,000.00 = | $60,292,050.00 |
| 2013 | $(1/(1+0.02))^{11}$ | = | 0.8043 | x $73,500,000.00 = | $59,116,050.00 |
| 2014 | $(1/(1+0.02))^{12}$ | = | 0.7885 | x $73,500,000.00 = | $57,954,750.00 |
| 2015 | $(1/(1+0.02))^{13}$ | = | 0.7730 | x $73,500,000.00 = | $56,815,500.00 |
| 2016 | $(1/(1+0.02))^{14}$ | = | 0.7579 | x $73,500,000.00 = | $55,705,650.00 |

2017        $(1/(1+0.02))^{15}$ =   0.7430        x $73,500,000.00 = $54,610,500.00

Total present value of invention of at least the sum of   =      $785,752,100.00

Total punitive damages claimed of at least the sum of   =      $7,071,768,900.00

Grand total damages of at least the sum of            =      $7,857,521,100.00

Finally, in opposition to arguments under the general heading: "Sever Cannot Be Awarded The Patent As Damages" on pages 4 and 5 on the defendants' Memorandum of Law in Support of Defendants' Motion in Limine Regarding Proof of Damages, Sever does not seek an award of the patent as damages. Sever merely seeks the reasonable present value of the patent over its life. Although Sever agrees that the patent cannot be awarded, Sever disagrees that he cannot seek money damages for defendants' misappropriation of it. See *Chou* v. *University of Chicago*, 254 F.3d 1347 (Fed. Cir. 2001) ("In 1999, Chou sued Roizman, the University/ARCH, and Aviron (collectively, 'the defendants') for correction of inventorship under 35 U.S.C. § 256, seeking to be named as the sole inventor on the '688 patent, or, in the alternative, as a co-inventor along with Roizman ... The district court also dismissed under Fed. R. Civ. P. 12(b)(6) all of her state law claims except her count for conversion."); *Adam Ippolito* v. *Yoko O. Lennon*, 542 N.Y.S.2d 3, 150 A.D.2d 300 (1989) ("[u]nder an expanded definition of the tort, conversion is limited to those intangible property rights customarily merged in, or identified with, some document (Prosser and Keeton, Torts, at 91-92 [5th ed 1984]; Restatement [Second] of Torts §§ 222 A, 242 [1965]).)" In regard to patent assignments, see *Waterman* v. *Mackenzie*, 138 U.S. 252, 255 (1891):

"Every patent issued under the laws of the United States for an invention or discovery contains "a grant to the patentee, his heirs and assigns, for the term of seventeen years, of the exclusive right to make, use and vend the invention or discovery throughout the United States and the Territories thereof." Rev. Stat. § 4884. The monopoly thus granted is one entire thing, and cannot be divided into parts, except as authorized by those laws. The patentee or his assigns may, by instrument in writing, assign, grant and convey, either, 1st, the whole patent, comprising the exclusive right to make, use and vend the invention throughout the United States; or, 2d, an undivided part or share of that exclusive right; or, 3d, the exclusive right under the patent within and throughout a specified part of the United States. Rev. Stat. § 4898. A transfer of either of these three kinds of interests is an assignment, properly speaking, and vests in the assignee a title in so much of the patent itself, with a right to sue infringers; in the second case, jointly with the assignor; in the first and third cases, in the name of the assignee alone. Any assignment or transfer, short of one of these, is a mere license, giving the licensee no title in the patent, and no right to sue at law in his own name for an infringement. Rev. Stat. § 4919; *Gayler v. Wilder*, 10 How. 477, 494, 495; *Moore v. Marsh*, 7 Wall. 515. In equity, as at law, when the transfer amounts to a license only, the title remains in the owner of the patent; and suit must be brought in his name, and never in the name of the licensee alone, unless that is necessary to prevent an absolute failure of justice, as where the patentee is the infringer, and cannot sue himself. Any rights of the licensee must be enforced through or in the name of the owner of the patent, and perhaps, if necessary to protect the rights of all parties, joining the licensee with him as a plaintiff. Rev. Stat. § 4921. *Littlefield v. Perry*, 21 Wall. 205, 223; *Paper Bag Cases*, 105 U.S. 766, 771; *Birdsell v. Shaliol*, 112 U.S. 485-487. And see *Renard v. Levinstein*, 2 Hem. & Mil. 628 . . . ."

In light of the forgoing, it is respectfully submitted that all patent rights to the disputed invention have merged into the assignment from Glickman to

Delcalth.   As such the disputed intangible patent rights are subject to the exception articulated in *Adam Ippolito* v. *Yoko O. Lennon*, 542 N.Y.S.2d 3, 150 A.D.2d 300 (1989).  Thus, Sever's conversion claim against Delcath is valid and sound.   It is the money value of these patent rights for which Sever seeks damages and not the patent itself.

Furthermore, Sever is also entitled to recover punitive damages.   In *James* v. *Powell*, 279 N.Y.S.2d 10, 17-18, 225 N.E.2d 741 (1967), reargument denied, 280 N.Y.S.2d 1025, 227 N.E.2d 408 (1967), the court explained the law to apply on the issue of punitive damages and stated:

> "One point remains—whether the courts below were empowered to make an award of punitive damages against the defendant Powell.   (Footnote omitted.)  Although it is clear that the measurement of compensatory damages is determined by the same law under which the cause of action arises (citations omitted) this is not necessarily true with regard to exemplary damages.   An award of compensatory damages depends upon the *existence* of wrongdoing – in this case, an issue for resolution under the *lex situs* of the property alleged to have been fraudulently conveyed.  An award of punitive damages, on the other hand, depends upon the object or purpose of the wrongdoing and on this issue we should look to the 'law of the jurisdiction with the strongest interest in the resolution of the particular issue presented.'"

Also see *Istim* v. *Chemical Bank,* 581 N.E.2d 1042; 78 N.Y.2d 342 (1991) ("Under the 'interests analysis' approach, the "law of the jurisdiction having the greatest interest in the litigation will be applied and * * * the [only] facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict' (*Schultz v Boy Scouts*, 65

24

N.Y.2d 189, 197, *supra* [quoting *Miller v Miller*, 22 N.Y.2d 12, 15-16]).  Because interests analysis is an analytical approach of general application and has been employed by this Court in recent years in a number of areas of law, we see no reason not to apply this approach to the present turnover proceeding concerning competing claims to a settlement fund."); *Feldman* v. *Acapulco Princess Hotel*; 520 N.Y.S.2d 477, 137 Misc.2d 878 (1987) ("To prevail, the court continued, the party must also establish 'that there are enough important contacts between the parties, the occurrence and the New York forum to implicate our public policy and thus preclude enforcement of the foreign law.'").

Section 145(2) of the Restatement (Second) of Conflict of Laws provides: "Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."  Note that although the Commonwealth of Virginia is the place where some of the initial injury occurred, Sever has long left Commonwealth of Virginia and now has resided in State of Florida for almost the last five years. Therefore, Commonwealth of Virginia is now, a virtual stranger to the instant controversy.  Defendant Feldman is central to all of the torts in this case. Defendant Feldman is a domicile of State of New York and New York is the place where the conduct causing the injury first and primarily occurred.

Feldman is incorporated as a professional corporation.   His professional corporation is based in State of New York.  The State of New York is the locus of the fraud and conspiracy claims and the place where the relationship between all of the parties to this controversy is centered.  Thus, the law of New York should apply to all of Sever's claims.

In *Sever* v. *Glickman*, 298 F.Supp.2d 267, 271 n. 1 (Conn. 2004), this Court stated in part that:

> "1.    This court's subject matter jurisdiction was invoked pursuant to diversity jurisdiction, and thus, as a general matter, Connecticut law would govern the counterclaims.  *See, e.g., Executive Airlines v. Electric Boat Corp.*, 271 F.Supp.2d 392, 395-6 (D.Conn.2003) (in diversity action court looks to law of the forum state to determine the substantive law that should apply to this dispute).   Nevertheless, both parties rely principally on New York law in their respective briefs and therefore implicitly concede that New York law governs the counterclaim.   The court therefore applies New York law in determining the merits of the within motion . . . ."

In *Executive Airlines* v. *Electric Boat Corp.*, 271 F.Supp.2d 392, 395-6 (Conn. 2003), this Court cited *Erie R. Co.* v. *Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state.").

As the court noted in *O'connor* v. *O'connor,* 201 Conn. 632, 519 A.2d 13 (1986), the State of Connecticut, has abandoned the strict application of the lex loci delicti rule in the resolution of tort claims in their courts.

> "We have recognized that there are circumstances in which strict application of the lex loci delicti rule frustrates the legitimate expectations of the

parties and undermines an important policy of this state.    In such circumstances, we have refused to apply the doctrine. *Simaitis v. Flood*, 182 Conn. 24, 437 A.2d 828 (1980).

.        .        .

"We are, therefore, persuaded that the time has come for the law in this state to abandon categorical allegiance to the doctrine of lex loci delicti in tort actions.

.        .        .

"Section 145 of the Restatement Second provides in subsection (1) that '[t]he rights and liabilities of the parties with respect to an issue are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in 6.' Section 6 of the Restatement, in turn, provides: '(1) A court, subject to Constitutional restrictions, will follow a statutory directive of its own state on choice of law. (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protections of justified expectations,(e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.'

.        .        .

"For assistance in our evaluation of the policy choices set out in 145 (1) and 6(2), we turn next to 145(2) of the Restatement, which establishes black-letter rules of priority to facilitate the application of the principles of 6 to tort cases.    See H. Kay, 'Theory into Practice: Choice of Law in the Courts,' 34 Mercer L. Rev. 521, 555 (1983).    Section 145(2) provides: 'Contacts to be taken into account in applying the principles of 6 to determine the law applicable to an issue include: **(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence,**

> **nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.** These contacts are to be evaluated according to their relative importance with respect to the particular issue.'" (Bold emphasis added.)

The State of New York, just as the State of Connecticut as stated above, has also abandoned the strict application of the lex loci delicti rule in the resolution of tort claims in their courts. As the court noted in *Elson* v. *Defren*, 283 A.D.2d 109, 726 N.Y.S.2d 407 (N.Y.App.Div. 2001):

> "... In Babcock v Jackson (12 NY2d 473, 481), the Court of Appeals abandoned the traditional law of the place of the tort (lex loci delicti) approach to choice of law problems arising in tort and adopted a more flexible approach **to give 'controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation.'** Thus, Babcock has generated **an 'interest analysis' rule that gives effect to the law of the jurisdiction having the greatest interest in resolving the particular issue involved.'**
>
> .    .    .
>
> "An evaluation of the 'facts or contacts which *** relate to the purpose of the particular law in conflict' determines the greater interest. (Schultz v Boy Scouts of America, Inc., 65 NY2d 189, 197, quoting Miller v Miller, 22 NY2d 12, 15-16.) 'Under this formulation, **the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort**.' (Id.)'" (Bold emphasis added.)

## Conclusion

Sever is entitled to recover damages based upon the law stated herein. Sever is also entitled to recover punitive damages as permitted by the laws of the State of New York.

WHEREFORE, plaintiff, Frank Sever, Jr., respectfully requests that this Honorable Court deny Defendants' Motion in Limine on Damages.

Respectfully submitted,

_____
Peter Paul Mitrano (admitted *pro hac vice*)
Ct. Fed. Bar No.: 23733
Suite 201
581 Boylston Street
Boston, Massachusetts  02116
(617) 236-5655

Local Connecticut Counsel:

_____
Frank B. Velardi, Jr.
Ct. Fed. Bar No.: 07893
Lasala, Walsh, Wicklow & Velardi
168 Bradley Street
Post Office Box 1302
New Haven, Connecticut  06505-1302
(203) 785-8929
(203) 776-4663 (facsimile)

Attorneys for Plaintiff
Frank Sever, Jr.

Dated: July 14, 2004.

<u>Certificate of Service</u>

I hereby certify that I caused a copy of the foregoing Plaintiff's Opposition to Defendants' Motion in Limine on Damages to be deposited with the United States Postal Service, postage prepaid for first-class mail, on this 14th day of July 2004 addressed to Joseph L. Clasen, Esquire and James M. Ruel, Esquire, Robinson & Cole LLP, Financial Centre, 695 East Main Street, Post Office Box 10305, Stamford, Connecticut  06904-2305.

_____

Peter Paul Mitrano